Jack TRIEF, et al., Plaintiffs,

v.

The DUN & BRADSTREET CORPORATION, Charles W. Moritz, and Robert B. Weissman, Defendants.

No. 89 Civ. 1741 (DNE).

United States District Court, S.D. New York.

Dec. 28, 1993.

Goodkind Labaton Rudoff & Sucharow, New York City (Edward Labaton, Linda P. Nussbaum, of counsel), lead counsel for plaintiffs.

Skadden, Arps, Slate, Meagher & Flom, New York City (Barry H. Garfinkel, Seth M. Schwartz, Maura B. Grinalds, of counsel), for defendants.

## MEMORANDUM & ORDER

EDELSTEIN, District Judge:

On September 30, 1993, this Court held a hearing, pursuant to Federal Rule of Civil Procedure 23(e), to determine whether the proposed settlement of this class action is fair, reasonable, and adequate. In addition, on September 30, 1993, this Court heard argument on class counsels' application for fees and expenses. For the reasons discussed below, the settlement of this action is approved. Class counsel is awarded attorney's fees in the amount of $2,187,031.20, and reimbursement of their litigation expenses, totalling $305,000.00.

## BACKGROUND

### I. Plaintiffs' Claims

Plaintiffs brought the above-captioned suit pursuant to Federal Rule of Civil Procedure ("Rule") 23 on behalf of a class consisting of all persons who purchased Dun & Bradstreet Corporation common stock between October 2, 1986 and November 15, 1989 (the "Class Period"). Plaintiffs asserted that defendants Dun & Bradstreet Corporation ("D & B"), Charles W. Moritz, and Robert B. Weissman violated Sections 20(a) and 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), Securities and Exchange Commission ("SEC") Rule 10b–5, and committed common law fraud and negligent misrepresentation.

The Dun & Bradstreet Corporation is a Delaware corporation with its principal place

of business in New York. Charles Moritz is the Chairman and Chief Executive Officer of D & B. Robert B. Weissman is D & B's President and Chief Operating Officer. D & B is a holding company whose operations are divided into three segments: (1) Business and Information Services, which includes Dun & Bradstreet Credit Services ("D & B Credit Services"); (2) Publishing Services; and (3) Marketing Services. As of February 17, 1989, D & B had 187,177,507 shares of common stock outstanding, which were held by approximately 15,956 shareholders of record. D & B common stock is traded on the New York Stock Exchange, as well as on several other exchanges.

Plaintiffs' suit is based on the alleged unlawful practices of D & B Credit Services. D & B Credit Services supplies credit information to approximately 62,000 customers. It maintains an extensive data base containing financial, credit, and marketing information on more than thirteen million companies located in the United States and abroad. Through this data base, which is the largest of its kind in the world, D & B Credit Services controls approximately ninety percent of the market for corporate credit information.

During the Class Period, D & B's SEC filings, other publicly available documents, and statements to the public stated that D & B's earnings were growing and that D & B expected that its earnings would continue to grow. Meanwhile, according to plaintiffs, D & B developed a sales plan (the "Sales Plan") designed to defraud its customers. Plaintiffs contend that this Sales Plan led to an artificially inflated price for D & B stock.

The Sales Plan required those who wished access to D & B's credit reports to purchase and prepay for an annual subscription of "units" from D & B. The prepaid units were then traded for D & B credit reports. Plaintiffs allege that D & B deliberately encouraged customers to over-order units. For example, the Sales Plan allegedly placed a substantial premium on additional units ordered by a customer after the customer exhausted its initial allotment of units.

After inducing its customers to purchase more units than they might need, plaintiffs allege that D & B limited refunds and credits for those prepaid units that remained unused at the end of the year. Moreover, according to plaintiffs, D & B had full knowledge of every customer's unit usage, but as a matter of company policy it misled or failed to inform customers as to the amount of units they had consumed. Plaintiffs aver that, as a result of this scheme, customers were led to believe that they had used more units than they actually did, which induced them to renew their annual subscription of units in amounts greater than they would have had D & B provided accurate information.

Plaintiffs allege that as a consequence of the Sales Plan, D & B obtained hundreds of millions of dollars from defrauded customers, which artificially inflated D & B's earnings and revenues. Plaintiffs assert that, absent this scheme, D & B's net earnings during the Class Period would have been materially lower or nonexistent. The increased revenues resulting from the fraudulent activities had the concomitant effect of artificially inflating the price of D & B's common stock. As a result of this scheme, plaintiffs claim that they were fraudulently induced to purchase D & B stock and were subsequently economically harmed when the stock price fell.

In 1989, dissatisfied D & B customers began to complain that they had been charged for services that they had neither ordered nor received. On March 2, 1989, *The Wall Street Journal* published a front-page investigative article detailing allegations made by former D & B salesmen concerning misconduct in connection with the sale of units to customers. A number of D & B customers filed lawsuits against D & B. Defendants denied any wrongdoing. On June 23, 1989, D & B agreed to pay $18 million to settle a number of the lawsuits brought by D & B customers alleging fraud in connection with D & B Credit Services.

Plaintiffs further allege that throughout the Class Period, D & B successfully withheld from the public the depth and nature of the consumer fraud scandal. Moreover, plaintiffs contend that D & B failed to reveal the true costs and impact that customer suits would impose upon D & B. On November

15, 1989, D & B disclosed for the first time that its earnings per share would fall; D & B blamed the fall on, *inter alia, The Wall Street Journal's* March 2, 1989 article. After D & B's November 15, 1989 announcement, D & B's common stock traded at a substantially lower price than it had prior to the announcement.

Following this series of events, numerous suits were filed by D & B shareholders against D & B in courts throughout the country. By order of the Judicial Panel on Multi–District Litigation dated August 14, 1989, related actions against D & B, pending in other federal district courts, were consolidated in this Court. A single consolidated complaint was filed in this Court on August 24, 1989. In an Opinion & Order, dated September 22, 1992, this Court certified a class "comprised of all persons (other than the defendants, or any officer, director, or partner of any defendant, members of their immediate families or entities controlled by them) who purchased Dun & Bradstreet Corporation common stock between October 2, 1986 and November 15, 1989." *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 203 (S.D.N.Y.1992).

## II. *The Proposed Settlement*

Pursuant to a Stipulation of Settlement entered into by the parties (the "Settlement"), D & B has agreed to make available the sum of up to twenty million dollars (the "Settlement Fund") in full satisfaction of all claims that have, or could have, been asserted by plaintiffs. The costs of administering the distribution of the Settlement, and class counsels' fees and expenses will be paid from the Settlement Fund.

Briefly summarized, the Settlement Fund will be distributed in the following manner. Fifteen cents will be allocated, as a recognized loss, for each share of D & B common stock purchased on the open market between October 2, 1986 and March 2, 1989, and sold on the open market at a loss between March 2, 1989 and November 14, 1989. Thirty cents will be allocated, as a recognized loss, for each share of D & B common stock purchased on the open market between October 2, 1986 and March 2, 1989, and sold on the

open market at a loss between November 15, 1989 and June 6, 1990. Fifty cents will be allocated, as a recognized loss, for each share of D & B common stock purchased on the open market between March 3, 1989 and November 14, 1989, and sold on the open market at a loss between November 15, 1989 and June 6, 1990. A claims administrator, KPMG Peat Marwick, will, *inter alia,* administer claims made by members of the plaintiff class, and determine claimants' eligibility for distribution. After all claims have been received and evaluated, payment will be made. If the sum of legitimate claims received exceeds the remainder of the Settlement Fund—after distribution of fees and expenses to class counsel and other expenses associated with administering the Settlement Fund—distribution will be made to eligible claimants on a *pro rata* basis.

## DISCUSSION

I. *The Parties' Joint Application for Approval of the Settlement*

■ The approval of a settlement in a class action suit is a matter of discretion for the trial court. *See In re Ivan F. Boesky Sec. Litig.,* 948 F.2d 1358, 1368 (2d Cir.1991); *Handschu v. Special Servs. Div.,* 787 F.2d 828, 833 (2d Cir.1986); *Breiterman v. Roper Corp.,* [1989–1990 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,885, 1990. WL 15535, *1, 1990 U.S.Dist. LEXIS 328, *2 (S.D.N.Y. 1990); *Stull v. Baker,* 410 F.Supp. 1326, 1332 (S.D.N.Y.1976) (citing cases). In evaluating a proposed settlement, the court must determine whether " 'the compromise is fair, reasonable and adequate.' " *In re Masters Mates & Pilots Pension Plan and IRAP Litig.,* 957 F.2d 1020, 1026 (2d Cir.1992) (quoting *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)). The court has the fiduciary responsibility of ensuring that the settlement is fair and that class members' interests were represented adequately. *In re Warner Communications Sec. Litig.,* 798 F.2d 35, 37 (2d Cir.1986).

■ The standards governing review of class action settlements are as follows:

First, the proponents have the burden of proving that (1) the settlement is not collusive but was reached after arm's length negotiations; (2) the proponents are counsel experienced in similar cases; (3) there has been sufficient discovery to enable counsel to act intelligently; and (4) the number of objectants or their relative interest is small. If the proponents establish these propositions, the burden of attacking the settlement then shifts to the objectants, if any. Finally, the Court must approve the settlement only after finding it to be reasonable in light of the plaintiffs' ultimate probability of success in the lawsuit.

*Breiterman*, 1990 WL 15535, at *1, 1990 U.S.Dist. LEXIS 328, at *3–*4 (citing *Krasner v. Dreyfus Corp.*, 90 F.R.D. 665, 667 (S.D.N.Y.1981)). The court also must determine whether notice was provided to all class members in the manner directed by the court. *See* Fed.R.Civ.P. 23(e).

In analyzing whether a class action settlement is reasonable in light of plaintiffs' probability of success on the merits, courts " 'have not applied any single, inflexible test.' " *Breiterman*, 1990 WL 15535, at *2, 1990 U.S.Dist. LEXIS 328, at *5 (quoting *Krasner*, 90 F.R.D. at 667). Rather, courts consider:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974) (citations omitted). In applying these factors, district courts do not attempt to decide the merits of the case, *see Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981), and, absent evidence of fraud or overreaching, consistently have refused to act as Monday morning quarterbacks in evaluating the judgement of counsel, *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F.Supp. 729, 737 (S.D.N.Y. 1993).

■ Each of the above-enumerated factors has been considered. The Settlement is not collusive; counsel is experienced in this genre of litigation; and enough discovery has occurred to permit counsel to evaluate the propriety of settlement as opposed to continued litigation. The parties have conducted extensive discovery to explore the merits of the various claims and defenses raised in this action and have vigorously advocated their respective positions. The Settlement was reached after arm's length negotiation. Notice has been provided to all class members in the manner directed by this Court.

Notably, no member of the class has filed a formal objection to the Settlement.[1] In light of the size of this class, this modest response strongly underscores the adequacy of the Settlement. Furthermore, the complexity, expense, and likely duration of further litigation in this matter favors approval of the Settlement. Continued litigation of this action would involve the determination of complex issues of causation and culpability. Securities class action litigation is " 'notably difficult and notoriously uncertain.' " *Kazanas v. Millicom, Inc.*, [1992–1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,255, 1992 WL 237358, *1, 1992 U.S.Dist. LEXIS 14043, *2 (S.D.N.Y.1992) (quoting *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y.1973)).

---

1. No formal objection to the Settlement has been filed. Two letters have been received by the Court, however, which argue that the benefits of the Settlement Fund should extend to persons that did not sell their shares at a loss during the period recognized by the Settlement for the purposes of evaluating shareholders' losses ("recognized loss period"). I reject these arguments because those persons who did not sell their shares during the recognized loss period recovered any temporary decrease in the shares' value when the shares' value increased subsequent to the close of the recognized loss period.

In addition, the attorneys who have litigated this action believe that the Settlement is fair, reasonable, and adequate. (*See Trief v. Dun & Bradstreet Corp.*, 89 Civ. 1741 (DNE), Sep. 30, 1993 Hearing Transcript ("Tr."), at 6, 10, 14). These views, expressed by counsel experienced in this genre of litigation, weigh heavily in favor of approval of the Settlement. *See In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F.Supp. 729, 737 (citing *Weinberger v. Kendrick*, 698 F.2d 61, 75–76 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)).

It is beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members. Thus, in light of all the factors addressed above, I find that the Settlement is fair, reasonable, and adequate. Accordingly, the Settlement is approved.

## II. *Class Counsels' Application for an Award of Fees and Expenses*

Plaintiffs' attorneys request an award of fees in the amount of $6,000,000.00, and reimbursement of expenses totalling $305,000.00. Counsel aver that they should be awarded thirty percent of the Settlement Fund, as calculated by the percentage-of-recovery method. Alternatively, counsel aver that they should be awarded $6,000,000.00 under the lodestar method. Defendants take no position as to the propriety of class counsels' application for an award of fees and expenses. (*See* Tr. at 23).

When a common fund is created as a result of a class action settlement, the court is empowered to apportion plaintiffs' attorney's fees among those who have benefited from the creation of a settlement fund by charging the fees against that fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *Breiterman*, 1990 WL 15535, at *3, 1990 U.S.Dist. LEXIS 328, at *7 (citing *Desimone v. Industrial Bio–Test Labs., Inc.*, 83 F.R.D. 615, 621 (S.D.N.Y.1979)). When a fund is created through the settlement of a class action suit, the court, as guardian of the rights of the class members, is not bound by the amount of the fee award that counsel has requested. This is true even when, as here, notice of the fee request has been provided to all class members, and no objections have been received by the court. *See Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); *see also Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884 (2d Cir.), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F.Supp. 729, 741.

Plaintiffs' attorneys argue in favor of a percentage-of-recovery award. Under the law of the Second Circuit, however, the "lodestar method" must be employed in order to compute attorney's fees to be assessed against a common fund. The lodestar method was first approved in a common fund case by the Second Circuit Court of Appeals in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470–71 (2d Cir.1974). The lodestar method is now accepted as the proper approach to determine reasonable attorney's fees in the context of a class action suit prosecuted on a contingency basis. *See Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F.Supp. 729, 741.

Under the lodestar method, the court computes a "lodestar figure" by multiplying the number of hours reasonably expended in litigation by a reasonable hourly rate. These variables are ascertained through the court's review of time records submitted by counsel. *See Gucci Am., Inc. v. Rebecca Gold Enters.*, 89 Civ. 4736 (BN), 1993 WL 88270, at *3 n. 2, 1993 U.S.Dist. LEXIS 3486, *slip op.*, at *8 n. 2 (S.D.N.Y. Mar. 23, 1993) (citing *Lewis v. Coughlin*, 801 F.2d 570, 577 (2d Cir.1986)). In order to compensate counsel for the time value of money attributable to the delay between the time that legal services are rendered and the time payment is received from the common fund, the court may apply counsel's current hourly rates in computing the lodestar. *See Grant*, 973 F.2d at 100. Once this computation is complete, "there is a 'strong presumption that the lodestar figure

represents the reasonable fee.'" *Grant*, 973 F.2d at 101; *see also In re Bolar Pharmaceutical Co., Inc. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir.1992) (citation omitted) (lodestar figure "strongly presumed to be reasonable"); *Huntington Branch, NAACP v. Town of Huntington*, 961 F.2d 1048, 1050 (2d Cir.1992) (same).

■ The total lodestar for plaintiffs' counsel is $2,187,031.20. *See* Affidavit of Edward Labaton, Exhibit 19.[2] This lodestar properly incorporates current hourly rates in order to compensate counsel for the time value of money. *See Missouri v. Jenkins*, 491 U.S. 274, 282, 109 S.Ct. 2463, 2468, 105 L.Ed.2d 229 (1989); *City of New York v. Darling–Delaware*, 440 F.Supp. 1132, 1134 (S.D.N.Y.1977); *see also Grant*, 973 F.2d at 100 (whether to apply current or historic rates is a matter for the court's discretion); *In re Generics Corp. of Am. Sec. Litig.*, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,719, at 98,770, 1980 WL 1468 (S.D.N.Y. Dec. 4, 1980) ("[T]he use of current rates is appropriate to compensate for the delay in receiving compensation, inflationary losses, and the loss of interest."). I find that the hours expended by counsel were reasonable and the fee charged by counsel appropriate. Therefore, the lodestar figure calculated by plaintiffs' counsel is proper.

Plaintiffs' counsel argue that, in light of the quality of representation provided to plaintiff class, the risk of nonrecovery, the complex issues of law and fact present in this matter, and the quality of defense counsel, a lodestar multiplier of 2.74 is appropriate. Under such an approach, the lodestar figure—here $2,187,031.20—would be multiplied by a risk factor to arrive at a calculation of the fee to be deducted from the common fund and allocated among counsel.[3] One common approach until recently was to derive a risk enhancement factor to compensate counsel for the risk associated with nonrecovery in contingent-fee litigation. For example, assuming that the court can ascertain the risk in percentage terms that plaintiffs, at the outset of the litigation, would not obtain a money judgment or a beneficial settlement, a risk enhancement factor theoretically may be computed by dividing 1 by the difference between 1 and that percentage in decimal terms that represents the risk of nonrecovery. For example, if, at the outset of litigation, the court were to adjudge that there was a 20% (0.2) risk that plaintiffs would lose their lawsuit outright—that plaintiffs would neither prevail on the merits nor settle—the risk enhancement factor would be 1.25.[4] In this example, the lodestar figure would then be multiplied by 1.25 to arrive at a figure theoretically representing reasonable attorney's fees.

While this method has been employed by courts in the Second Circuit, its use consistently has been subject to stringent requirements. The lodestar figure alone, without enhancement for risk, has long been presumed to represent a reasonable fee. *See, e.g., Grant*, 973 F.2d at 101; *In re Bolar Pharmaceutical Co., Inc. Sec. Litig.*, 966 F.2d at 732; *Huntington Branch, NAACP*, 961 F.2d at 1050. One test employed by courts in this Circuit in determining whether to enhance the lodestar by a multiplier was whether fee enhancement was necessary in order to induce competent counsel to represent clients on a contingent-fee basis in the type of litigation before the court. *See Friends of the Earth v. Eastman Kodak Co.*, 834 F.2d 295, 298 (2d Cir.1987). Only if the district court found that a class of plaintiffs otherwise would be denied effective access to the court was a risk enhancement proper. *See id.*

A recent Supreme Court case, *City of Burlington v. Dague*, — U.S. —, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), has substantially foreclosed the use of a multiplier based on

---

2. The lodestar figure listed in this affidavit has been independently analyzed by this Court. I find that this calculation is both reasonable and accurate.

3. Using plaintiffs' counsels' proposed multiplier for the purpose of illustration, the lodestar, $2,187,031.20, would be multiplied by 2.74, the product of which, *i.e.* $5,992,465.49, would theoretically represent reasonable attorney's fees.

4. This figure is derived in the following manner:

$$\frac{1}{(1 - .2)} = \frac{1}{.8} = 1.25$$

risk of loss or other factors to enhance the lodestar. In *City of Burlington*, the Court considered whether, under a federal statute mandating fee-shifting, a court could "enhance the fee award above the 'lodestar' amount in order to reflect the fact that the party's attorneys were retained on a contingent-fee basis and thus assumed the risk of receiving no payment at all for their services." *Id.* —— U.S. at ——, 112 S.Ct. at 2639. The *City of Burlington* Court held that such an enhancement was not permitted.

The *City of Burlington* Court's reasoning is both persuasive and directly on point. First, the *City of Burlington* Court noted that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar." *Id.* —— U.S. at ——, 112 S.Ct. at 2641. For example, the Court indicated that the risk of loss in a particular case is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing the claim. *See id.* As to the latter, the Court stated that the lodestar adequately compensates contingent-fee counsel because the lodestar reflects the "higher number of hours expended to overcome the difficulty, or . . . the higher hourly rate of the attorney skilled and experienced enough to do so." *Id.* As to the former factor implicated in risk of loss, the Court held that rewarding attorneys for prosecuting relatively meritless claims by enhancing fees to take into account the difficulty of proving such claims would have a negative societal impact. *See id.* —— U.S. at ——, 112 S.Ct. at 2641–42. Succinctly stated, risk enhancement generates wasteful societal costs by creating identical incentives for the bringing of meritorious and relatively meritless claims. *See id.* Without risk enhancement, attorneys are more likely to pursue only those claims that they genuinely believe to be meritorious, thus attenuating the likelihood that relatively meritless

suits will be brought merely to force a settlement.

Second, the *City of Burlington* Court explicitly rejected the test espoused by the Second Circuit in *Friends of the Earth v. Eastman Kodak Co.,* 834 F.2d 295, 298 (2d Cir.1987). Among other reasons, the Court rejected this approach because the Court did not "see how it can intelligibly be applied." *City of Burlington,* —— U.S. at ——, 112 S.Ct. at 2642. In essence, the Court found that the *Friends of the Earth* test merely reincorporated in fee calculation the inexactitude that the lodestar method is designed to reduce.

Finally, the Court considered the impact of the availability of lodestar enhancement on the setting of fees by the district court and determined that "[c]ontingency enhancement would make the setting of fees more complex and arbitrary, hence more unpredictable, and hence more litigable." *Id.* —— U.S. at ——, 112 S.Ct. at 2643. Accordingly, the *City of Burlington* Court held that enhancement for contingency risk was not permitted under the fee-shifting statutes at issue in that case.

*City of Burlington v. Dague,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), deals explicitly with the computation of attorney's fees in the context of a federal statute mandating fee-shifting rather than in connection with a class action suit. Class counsel argue that *City of Burlington* is distinguishable from the instant case for this reason.[5] The language of the opinion, however, strongly suggests that the Court's holding is applicable to common fund cases. *See generally id.; see also In re Bolar Pharmaceutical Co., Inc. Sec. Litig.,* 800 F.Supp. 1091, 1095–96 (E.D.N.Y.1992) (holding that the limitation on multipliers enunciated by the Supreme Court applies to equitable fund cases). Moreover, the *City of Burlington* Court's reasoning is directly applicable to class action

---

5. In order to provide the parties the opportunity to address several issues discussed in this Memorandum & Order that were not discussed in the moving briefs, the Court requested supplemental briefs addressing the propriety of enhancing the lodestar by a risk or contingency multiplier in light of *City of Burlington v. Dague,* —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), *Pennsylvania v. Delaware Valley Citizens Council,* 478

U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), their progeny, and other applicable case law. Consistent with the position taken by defendants at the September 30, 1993 hearing, defense counsel informed this Court that defendants would not take any position, or submit a brief, on these issues. Class counsel submitted a supplemental brief on December 21, 1993.

suits brought pursuant to Rule 23. Each consideration enunciated by the *City of Burlington* Court in declining to permit enhancement of the lodestar is equally relevant to the question of whether the lodestar should be enhanced in this case. The *City of Burlington* Court's analysis focused on evaluating what computations are subsumed in a lodestar calculation, the positive and negative impact of enhancing the lodestar, and whether enhancement is necessary to the calculation of a reasonable fee. This analysis is both relevant and prescient whenever a court must determine whether the lodestar method yields reasonable attorney's fees; its applicability is not limited to the context of federal fee-shifting statutes.

Thus, I find that the lodestar figure represents a reasonable fee award in this case. Averaging the fee allocated to all lawyers that have worked on this case, as well as all support staff, the lodestar provides an average hourly fee of approximately $275.

The propriety of limiting class counsels' fees to the lodestar is further supported by the Second Circuit's oft-stated admonition that the lodestar figure is strongly presumed to be reasonable. *See, e.g., Grant*, 973 F.2d at 101; *In re Bolar Pharmaceutical Co., Inc. Sec. Litig.*, 966 F.2d at 732; *Huntington Branch, NAACP*, 961 F.2d at 1050. After carefully considering the briefs filed by class counsel in support of their fee request, I find that counsel have not been able to show that enhancement of the lodestar is necessary to the calculation of a reasonable fee award. Even if risk or contingency enhancement is proper in certain circumstances, class counsel have not shown that it is appropriate here. *See Grant*, 973 F.2d at 101 ("The party advocating [a departure from the lodestar] bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee.").

In sum, class counsel are entitled to fees totalling $2,187,031.20 plus their reasonable expenses. Because counsels' litigation expenses, $305,000.00, were reasonable, class counsel are entitled to an aggregate award of fees and expenses in the amount of $2,492,-031.20.

## CONCLUSION

For the reasons discussed above, the Settlement is approved. This Court will retain jurisdiction over this case pending final disposition and disbursement of the Settlement Fund. Plaintiffs' counsel are hereby awarded aggregate fees totalling $2,187,031.20, and reimbursement of their expenses, totalling $305,000.00. This sum, $2,492,031.20, will be deducted from the common fund created as a result of the settlement of this action. The parties are directed to submit to this Court, on or before January 14, 1994, a proposed judgment that is consistent with this Memorandum & Order.

SO ORDERED.