## In re SUMITOMO COPPER LITIGATION.

### No. 96 Civ. 4584 MP.

United States District Court, S.D. New York.

Oct. 7, 1999.

Lovell & Stewart, LLP, New York City, Lead Counsel for plaintiffs.

Miller Faucher Cafferty and Wexler, Chicago, IL, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Kirby McInerney & Squire LLP, New York City, Scott M. Brenner, New York City, Futterman & Howard, Chicago, IL, Meredith Cohen Greenfogel & Skirnick, Philadelphia, PA, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, Chicago, IL, Plotkin & Jacobs, Chicago, IL, David Schachman & Associates, Chicago, Illinois, Schubert & Reed L.L.P., San Francisco, CA, Stamell & Schager, New York City, Wolf Haldenstein Adler Freeman & Herz LLP, New York City, other Counsel for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Sumitomo

Corporation and Sumitomo Corporation of America.

Cadwalader, Wickersham & Taft, New York City, for defendant Global Minerals and Metals Corp.

Loeb & Loeb, New York City, for defendants R. David Campbell and Bipin Shah.

Rogers & Wells, New York City, for defendants Merrill Lynch & Co., Merrill Lynch Commodity Financing Inc. and Merrill Lynch Pierce Fenner & Smith, Inc.

Katten Muchin & Zavis, Chicago, IL, for defendant Morgan Stanley & Co., Inc.

## OPINION

MILTON POLLACK, Senior District Judge.

Plaintiffs have moved for an order granting final certification of the settlement Class[1] and for approval of the proposed settlements with four groups of defendants involving an aggregate of $134,600,000 as fair, reasonable and adequate, and in pursuance of the requirements of Rule 23 of the Federal Rules of Civil Procedure.

These settlements (which, with interest, has now grown to in excess of $139,000,000) are reportedly[2] the largest class action recoveries in the more than seventy-five year history of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq.

These record-breaking settlements are all the more remarkable in light of (a) the notoriously high risk nature of prosecuting commodity manipulation cases generally,[3] (b) the widespread skepticism with which the financial community initially greeted plaintiffs' claims, (c) the substantial additional risks and difficulties which extensive early discovery revealed to be present in this case but which had been absent in all previous commodity manipulation cases, and (d) the rela-

tively very small amount of trading on the Comex copper market.

Two large traders and a minor fraction of other Class members elected to opt out of the settlement; and an objection based on damages sustained by absent Class members, which alleged that their claims were understated, was consensually resolved.

The settling defendants are:

**Sumitomo Corporation** ("Sumitomo") and **Sumitomo Corporation of America** ("SCOA"), which have paid a Settlement Amount of Ninety–Nine Million ($99,000,000) Dollars into an escrow account invested in United States Treasury bills pursuant to the terms of their Settlement Agreement with plaintiffs preliminarily approved by the Court on September 18, 1998.

**Morgan Stanley & Co. Incorporated** ("Morgan Stanley"), which has agreed to pay a Settlement Amount of One Million ($1,000,000) Dollars into an escrow account upon final approval of the settlement set forth in its Settlement Agreement with plaintiffs, which was preliminarily approved by the Court on October 1, 1998.

**Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Merrill Lynch Commodity Financing Inc., and Merrill Lynch Pierce Fenner & Smith (Brokers & Dealers) Limited** (the "Merrill Lynch defendants"), which have paid a Settlement Amount of Eighteen Million One Hundred Thousand ($18,100,000) Dollars into an escrow account invested in United States Treasury bills pursuant to the terms of a Settlement Agreement preliminarily approved by the Court on November 12, 1998, pursuant to which plaintiffs had the right to void the Settlement Agreement based upon the outcome of plaintiffs' confirmatory discovery. In June 1999, plaintiffs completed such discovery and "closed" this settlement.

---

1. The Class consists of all persons who purchased copper futures or options contracts between June 24, 1993 and June 15, 1996, inclusive, on the Commodity Exchange Inc. or its successor, the Comex division of the New York Mercantile Exchange (collectively "Comex").

2. Reportedly, the $134,600,000 in partial settlements thus far obtained in this action already constitute more than twice as much as the previ-

ous record class settlement under the CEA. "Merrill, Global Trading to Settle Sumitomo Trading–Scandal Suit", *The Wall Street Journal*, November 16, 1998, at p. B8.

3. See *"Manipulation of Commodity Futures Prices—The Unprosecutable Crime"*, by Jerry W. Markham, 8 Yale J. On Reg. 281 (1991).

Global Minerals and Metals Corporation ("Global"), **R. David Campbell** ("Campbell") and **Bipin Shah** ("Shah") (collectively Global, Campbell and Shah are referred to sometimes herein as the "Global defendants") who, pursuant to the terms of their Settlement Agreement with plaintiffs preliminarily approved on November 20, 1998, were obligated, jointly and severally, to pay a Settlement Amount of $16,500,000, which has been paid in full as of October 1, 1999.

On June 30, 1999 and July 15, 1999, the Court directed that a hearing be held on October 5, 1999 to finally determine the fairness, reasonableness, and adequacy of the proposed settlements. Pursuant to such orders, a Notice of Pendency of Class Action, Proposed Partial Settlement Thereof, and Hearing on Partial Settlement dated July 9, 1999 ("Class Notice") was approved by the Court, and mailed to the more than twenty thousand members of the Class. Pursuant to those same orders, a summary Notice has been extensively published in *The Wall Street Journal, The New York Times, USA Today,* as well as **eight** additional newspapers and posted on an Internet website.

The mailed Notice and proof of claim contained a description of the nature and history of this litigation, and a description of these settlements, including the total settlement amount, the text of the release to be given to defendants, and the date, time and location of the settlement hearing scheduled by the Court. The Notice further advised Class members of their right to opt-out or object to settlement approval, or fees and expenses, by filing and serving written objection no later than September 3, 1999.

## THE SETTLEMENT CLASS SATISFIES THE REQUIREMENTS OF RULE 23

The proposed settlement class consists of: persons who purchased Comex copper futures contracts between June 24, 1993 and June 15, 1996, inclusive. Excluded from the class are the defendants herein, any parents, subsidiaries or affiliates thereof, members of the immediate family of each of the individual defendants, any entity in which any of the defendants has a control-

ling interest, and the legal representatives, heirs, successors or assigns of any of the defendants.

For the same reasons that the two-year litigated class (from June 24, 1994 until June 15, 1996) was certified against the Global defendants, the three-year settlement class also satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, and accordingly is certified. *See In re Sumitomo Copper Litig.,* 182 F.R.D. 85 (S.D.N.Y.1998). All elements of Rule 23 are satisfied herein.

### Rule 23(a)(1): Numerosity.

■■■ In order to maintain a class under Rule 23(a)(1), the class must be so large that joinder of all members would be impracticable. *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 89; *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992), *cert. dismissed sub nom., Hart Holding Co., Inc. v. Drexel Burnham Lambert Group, Inc.,* 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). Here, the potential class numbers at least 20,000. This number exceeds the amount suggested under the standards of this Circuit and others. *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir.1972); *Town of New Castle v. Yonkers Contracting Co.,* 131 F.R.D. 38, 41 (S.D.N.Y.1990). Joinder of all members is impracticable. *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 89.

### Rule 23(a)(2) and Rule 23(b)(3): Predominance of Common Issues.

Rule 23(a)(2) requires the existence of questions of law or fact common to the class. Courts often consider Rule 23(a)(2) in conjunction with Rule 23(b)(3), which requires that common questions predominate over individual questions. *See, e.g., Id.; In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 163 F.R.D. 200, 206 (S.D.N.Y.1995).

■■ To prevail on a cause of action for commodity price manipulation under the CEA, plaintiffs must establish the following elements: (1) the existence of an artificial price, (2) an intent to cause an artificial price, and (3) causation of the artificial price by the defendants. *See, e.g., In re Sumitomo Cop-*

*per Litig., supra,* 182 F.R.D. at 89–90; *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir.1971), *cert. denied sub. nom. Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972).

■ Plaintiffs have demonstrated that their econometric methodologies have a reasonable probability of establishing whether copper futures prices were artificial during the Class Period. *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 89–95. All Class members have a common interest in pursuing the largely mathematical enterprise of establishing a correlation between copper futures and options positions and prices. *Id.; In re LTV Securities Litg.,* 88 F.R.D. 134, 141, 149 (N.D.Tex.1980).

Because a single, continuous conspiratorial artifice is alleged, the relevant proof will not vary among class members, and the case presents a fundamental question of the utmost importance to all class members. *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 93. Every plaintiff and every class member would have to engage in the same extensive international discovery and develop the same detailed proof to demonstrate a violation of the CEA and RICO. *Id.* The predominance requirement under Rule 23(b)(3) is therefore satisfied. *Id.* at 94.

### Rule 23(a)(3): Typicality.

■ Rule 23(a)(3) requires that plaintiffs' claims be typical of the class. *Id.* at 94–95; *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992); Rule 23(a)(3) typicality is satisfied here because 1) all plaintiffs and all proposed Class members, as purchasers and sellers of copper futures and options contracts, were affected by, and their claims arise from, the same alleged conspiracy to manipulate copper prices and 2) all plaintiffs and all proposed Class members make the same legal claims under the CEA and RICO. *Id.; In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 1995 WL 798907 at *16 (S.D.N.Y. Nov. 20, 1995) (Pollack, J.). The single conspiracy alleged is to be proved as to all class members by the same "course of events" (and the same legal arguments) which will establish the violations of RICO and the CEA. *Id.; In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 95.

### Rule 23(a)(4): Adequacy of Class Representation.

■ Rule 23(a)(4) requires that, in order for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation requires that the class representative's attorney be qualified, and that the class representative not have interests conflicting with the class in the litigation at hand. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Plummer v. Chemical Bank,* 668 F.2d 654, 658 (2d Cir.1982). Both of these criteria are satisfied here.

Class Counsel appointed by the Court have, as this Court has previously found, conducted previous antitrust, securities and commodity futures class actions in this Circuit and "have vigorously investigated, developed and prosecuted the claims in this litigation". *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 96.

Rule 23(a)(4) is satisfied.

### Rule 23(b)(3): This Action is Superior to Any Possible Alternatives.

■ Here, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). The utility of presenting the claims asserted in this action through the class action method is substantial since at least 20,000 individuals may have been injured, but many of those individuals may not have been damaged to a degree which would induce an individual to institute litigation solely on his own behalf. *See In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 97 n. 17. Plaintiffs have asserted that they are not aware of **any** pending lawsuits by individual plaintiffs. Given the enormous expenditures necessary to litigate the claims at issue here, it is not surprising that no individuals have undertaken to independently challenge defendants' alleged misconduct. *Id.; In re Prudential, supra,* 1995 WL 798907 at *16.

Moreover, any problems in the management of this lawsuit which might have arisen would not unduly stretch the creative capaci-

ties of counsel or the Court. *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 97. Additionally, plaintiffs' experts have attested that the amount of price artificiality caused by the defendants may be calculated by classwide methods, on a percentage or absolute basis for each day.

In sum, this action presents no manageability problems under Rule 23(b)(3). *In re Sumitomo Copper Litig., supra,* 182 F.R.D. at 97.

### THE STANDARDS FOR JUDICIAL APPROVAL OF A SETTLEMENT UNDER RULE 23(c)

The settlements now before this Court amply satisfy the criteria for final approval set forth by this Court and the Second Circuit. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974); *In re Prudential Sec. Litig.,* 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (Pollack, J.); *In re Milken and Assoc. Sec. Litig.,* 150 F.R.D. 46 (S.D.N.Y. 1993) (Pollack, J.); *In re Drexel Burnham Lambert Group, Inc.,* 130 B.R. 910 (S.D.N.Y. 1991) (Pollack, J.); *In re RJR Nabisco, Inc. Sec. Litig.,* [1992 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,984 (S.D.N.Y.1992); *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588 (S.D.N.Y.1992). *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 740–41 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35, 37 (2d Cir.1986).

### A. *Settlement Is Judicially Favored, Particularly In Class Actions*

■ The arm's-length compromise of a disputed claim has long been favored by the courts. *E.g., Hennessy v. Bacon,* 137 U.S. 78, 85, 11 S.Ct. 17, 34 L.Ed. 605 (1890). Indeed, there is a "general policy favoring the settlement of litigation." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). This is particularly true of class actions. As stated in *Air Line Stewards & Stewardesses Ass'n v. Trans World Airlines, Inc.,* 630 F.2d 1164, 1166–67 (7th Cir.1980), *aff'd sub nom., Zipes v. Trans World Airlines,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982):

Federal courts look with great favor upon the voluntary resolution of litigation through settlement.... This rule has particular force regarding class action lawsuits.

■ Settlement approval is within the Court's discretion, which "should be exercised in light of the general judicial policy favoring settlement." *In re PaineWebber Ltd. Partnerships Litig.,* 171 F.R.D. 104, 124 (S.D.N.Y.), *aff'd,* 117 F.3d 721 (2d Cir.1997) (*per curiam* ).

### B. *The Establishment of Arms–Length Bargaining Merits A Presumption of Fairness of the Proposed Settlements*

■ As recommended by the Second Circuit and others, courts often focus on the "negotiating process by which the settlement was reached..." *Weinberger v. Kendrick, supra,* 698 F.2d at 74. *Accord, e.g., Ionosphere Clubs, supra,* 156 B.R. at 428. "In assessing the fairness of a settlement, courts consider whether the settlement was the result of good-faith bargaining at arms-length by experienced counsel, and whether there is any evidence of collusion." *State of New York v. Reebok Int'l,* 903 F.Supp. 532, at 535 (S.D.N.Y.1995). *Accord, e.g., Weinberger v. Kendrick, supra,* 698 F.2d at 74; *State of New York v. Nintendo of America,* 775 F.Supp. 676 (S.D.N.Y.1991).

As noted in *In re PaineWebber Ltd. Partnerships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y.), " 'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation" (citation omitted).

"Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

■ "So long as the integrity of the arm's length negotiation process is preserved ... a **strong initial presumption of fairness attaches to the proposed settlement.**" *In re PaineWebber,* 171 F.R.D. at 125 (emphasis supplied). As likewise stated by the *Manual for Complex Litigation,* a "**presumption of fairness, adequacy and reasonableness**

may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery." *Manual for Complex Litigation, Third* ¶ 30.42 (1995) (emphasis supplied). That presumption clearly attaches here.

### C. *The Grinnell Factors*

In *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974) (*"Grinnell"*), the Second Circuit Court of Appeals held that the following were factors to be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement....; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ... (citations omitted).

*Accord, In re Prudential, supra,* 1995 WL 798907 at *13–16 (following and applying *Grinnell* factors). An analysis of these factors demonstrates that the proposed settlements amply satisfy each of the applicable criteria.

### 1. *The Complexity, Expense and Likely Duration of the Litigation*

The CEA manipulation and RICO claims being settled here presented a host of very complex (but manageable) factual and legal issues.

In this regard, "class action suits" in general "have a well-deserved reputation as being most complex". *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977). Second, in evaluating the settlement of a **securities** class action, federal courts, including this Court, "have long recognized that such litigation 'is notably difficult and notoriously un-

certain.'" *In re Michael Milken and Assoc. Sec. Litig.,* 150 F.R.D. 46, 53 (S.D.N.Y.1993) (Pollack, J.), quoting *Lewis v. Newman,* 59 F.R.D. 525, 528 (S.D.N.Y.1973).

In the absence of the proposed settlements, it is reasonably estimated that it would have required literally years and at least hundreds of thousands of dollars of additional costs to prosecute the settled claims to conclusion.

Accordingly, the settlements are fair, reasonable and adequate in light of the complexity, expense and duration of litigation. *In re Prudential, supra,* 1995 WL 798907 at *13; *Trief v. Dun & Bradstreet Corp.,* 840 F.Supp. 277, 282 (S.D.N.Y.1993); *In re Warner Communications Sec. Litig., supra,* 618 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986).

### 2. *The Reaction of the Class to the Settlement Strongly Favors Approval to the Proposed Settlement*

As mentioned above, only one objection was made to the estimate of recoverable damages and that was consensually resolved, and only two large traders and a minor fraction, fewer than 1%, of Class members opted out. These facts indicate that an overwhelming majority of the class members approve of the proposed settlements.

Accordingly, the absence of substantial objections and relative absence of opt-outs strongly favors approval of the proposed settlements. *In re Prudential, supra,* 1995 WL 798907 at *13. *See Maywalt v. Parker & Parsley Petroleum Co.,* 864 F.Supp. 1422 (S.D.N.Y.1994) *aff'd,* 67 F.3d 1072, 1995 U.S.App. LEXIS 28827 (2d Cir.1995).

### 3. *The Stage of the Proceedings, and the Amount of the Discovery Completed, Strongly Favor Approval of the Proposed Settlement*

Plaintiffs had conducted extensive discovery, investigation and analyses, and the proceedings were in the advanced stage of pointing or preparing for trial, when the settlements were reached. Among other things, plaintiffs' counsel aver that more than 11,000,000 pages of documents had been in-

spected, depositions and private sworn interviews had occurred, plaintiffs had briefed numerous motions, and plaintiffs had consulted extensively with numerous experts prior to the times of the settlements. Indeed, the settlements with the Global defendants and the Merrill Lynch defendants were made on the eve of the trial.

Plaintiffs were well informed of the strengths and weaknesses of their claims. Lovell Aff. ¶¶ 75–77. *In re Warner Communications, supra,* 618 F.Supp. at 745 (the parties had "a clear view of the strengths and weaknesses of their cases" at the time of the negotiations).

> The stage of the proceedings is such that the facts have been substantially developed and it is possible to form an intelligent judgment about the likely success of class plaintiffs' case. The compromise reached by class counsel has been neither arbitrary nor premature, but formed after careful investigation and weighing of facts. . . .

*In re Gulf Oil, supra,* 142 F.R.D. at 591.

Accordingly, the stage of the proceedings, and the amount of the discovery completed, strongly favor approval of the proposed settlement. *In re Prudential, supra,* 1995 WL 798907 at *14. *See Chatelain v. Prudential–Bache Securities, Inc.,* 805 F.Supp. at 209, 213, 214 (S.D.N.Y.1992).

### 4. *The Risks of Establishing Liability Strongly Favor the Proposed Settlements*

 There are numerous legal and factual risks of establishing liability. Because this action is continuing as against the non-settling defendants, plaintiffs refrained from particularizing all liability risks.

Notably, plaintiffs did not have the benefit of collateral estoppel. Thus, plaintiffs recognized the difficulty and uncertainty of proving liability to a jury, especially in a case of this complexity and magnitude involving three years of copper futures trading. Litigation in general, and class action litigation

in particular, is unpredictable. *See e.g., In re PaineWebber, supra,* 171 F.R.D. at 126 ("[l]itigation inherently involves risks.").

As was held in another case in this District, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *State of West Virginia v. Chas., Pfizer & Co.,* 314 F.Supp. 710, 743–44 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). In that opinion, Judge Wyatt offered the following example:

> In *Upson v. Otis,* 155 F.2d 606 (2d Cir. 1946), approval of a settlement was reversed, the Court saying (at 612): "on the facts presented to the district judge, the liability of the individual defendants was indubitable and the amount of recovery beyond doubt greater than that offered in the settlement. Accordingly, it was an abuse of discretion to approve the settlement." The action was then tried and plaintiffs obtained a judgment, twice considered by the Court of Appeals (168 F.2d 649, 169 F.2d 148) 1948. We are told, however, that "the ultimate recovery . . . turned out to be substantially less than the amount of the rejected compromise."

*Id.*[4]

Likewise, for example, a class action against the manufacturer of the drug Bendectin was originally settled, but settlement approval was reversed by the Sixth Circuit. *In re Bendectin Prod. Liab. Litig.,* 749 F.2d 300 (6th Cir.1984). Thereafter, as reported in *The Wall Street Journal* (March 13, 1985), the plaintiffs tried the case and, by jury verdict, lost the millions of dollars for which they had originally bargained. *See also, e.g., Backman v. Polaroid Corp.,* 910 F.2d 10, 17–18 (1st Cir.1990) (substantial verdict for class was reversed on appeal and the case dismissed, after 11 years of litigation); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 276–308 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783

---

**4.** Recurringly, when some of the largest members of classes have opted-out of the class to try to do better than the class, they have failed to establish impact or other elements of liability, and have lost their cases at trial. This occurred, for example, in the *Corrugated Container Antitrust Litig.,* and most recently in the *Carbon Dioxide Antitrust Litig.* See, e.g., In re Corrugated Container Antitrust Litig.,* 1983–2 Trade Cas. (CCH) ¶ 65,628 at 69,157 (S.D.Tex.1983).

(1980) (multimillion dollar judgment after a lengthy trial was reversed); *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 933 (10th Cir.) (per curiam), *cert. dism'd*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (reversing a $259.5 million judgment for plaintiff and awarding an $18.5 million counterclaim judgment for defendant); *Trans World Airlines, Inc. v. Hughes*, 312 F.Supp. 478, 479, 485 (S.D.N.Y.1970), *aff'd*, 449 F.2d 51 (2d Cir.1971), *rev'd*, 409 U.S. 363, 366, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) ($145 million judgment was overturned, after years of litigation and appeals).

If these settlements are not approved, and if defendants thereafter were to prevail at trial (or on any combination of their potential motions regarding other matters) then plaintiffs would likely recover nothing at all.

Accordingly, the risks of establishing liability strongly favor approval of the proposed settlements. *In re Prudential, supra,* 1995 WL 798907 at *14; *see Chatelain, supra,* 805 F.Supp. at 214; *Warner Communications, supra,* 618 F.Supp. at 743; *In re RJR Nabisco, Inc.,* [1992 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 6,984 at 94,267 (S.D.N.Y. Aug. 24, 1992).

5. ***The Risks of Establishing Damages Strongly Favor Approval of the Proposed Settlements***

██ Once again, plaintiffs faced substantial legal and factual risks in proving **any** damages, let alone a **substantial amount** of damages, in this litigation.

Even outside of the particularly risky proof of damages in commodity price manipulation cases, the history of litigation is replete with cases in which plaintiffs succeeded at trial on liability, but recovered no damages, or only disappointing damages, at trial, or on appeal. *See, e.g., United States Football League v. National Football League*, 644 F.Supp. 1040, 1042 (S.D.N.Y.1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages"), *aff'd*, 842 F.2d 1335, 1377 (2d Cir.1988) (affirming Judge Leisure's approval of the nominal damage verdict); *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081,

1166–69 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (judgment was remanded for a new trial and damages). *See also,* "MCI Awarded $37.8 Million in AT & T Case: Antitrust Damages Are Set At Sharply Lower Figure Than Earlier $600 Million", *The Wall Street Journal,* May 29, 1985 (damages at second trial reduced to 6% of original verdict). These record-breaking settlements are outstanding in light of the substantial risk that a jury might award only a modest judgment or find no damages at all.

Damages at trial inevitably would involve a "battle of the experts." As the Court observed in *In re Warner Communications, supra,* 618 F.Supp. at 744–45:

Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages.... In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad of non-actionable factors....

If these settlements are not approved, and if defendants thereafter were to prevail on any of their expert arguments against damages, either at trial or on appeal, then plaintiffs could well recover nothing at all.

In any event, the exact amount of damages need not be adjudicated for purposes of settlement approval. As has been noted, the "essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig.,* 659 F.2d 1322, 1325 (5th Cir. 1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982).

As held by the Court in *Ionosphere Clubs, Inc. v. American National Bank and Trust Company of Chicago,* 156 B.R. 414 (S.D.N.Y. 1993):

The world of settlements ... does not read like a balance sheet—nor should it. Assigning value to contested claims cannot be done with ... precision....

[T]he job of the reviewing court is to determine whether "the value of the pro-

posed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved, . . . ." The test for reasonable equivalence is "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." [citation omitted]

In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

156 B.R. at 427–28. And:

"[T]he weighing of a claim against compensation cannot be . . . exact. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim. . . ."

156 B.R. at 431.

The risks of establishing damages strongly favor approval of the proposed settlements. *In re Prudential, supra,* 1995 WL 798907 at *14.

### 6. *The Risks of Maintaining the Class Action Through Trial Favor Approval of the Proposed Settlements*

▮ In certifying the two-year class against the Global defendants, this Court noted that the class could be de-certified if the "potential conflicts" are later shown during the trial or otherwise to go to the issue of liability. *In re Sumitomo Copper Litig.,* 182 F.R.D. at 92 n. 9. There is absolutely no guarantee that, in presenting the trial of this case (including defendants' evidence), decertification of portions or all of the class would not occur.

If the class were to be decertified at trial, or if class certification were to be reversed on appeal, the class members (other than the named plaintiffs) would recover nothing at all. In the instant action, the Settling Defendants have consented to the certification of a Settlement Class in order to effectuate the settlements. The settlements allow those members of the Class to avoid facing the risk that the Class might not continue to be certified at trial.

Therefore, this factor favors approval of the proposed settlements.

Finally, the proposed settlements are definite and at hand. Even if plaintiffs were to prevail on every issue at both trials, they would face inevitable appeals, and the fact of life that many verdicts are reversed on appeal. This factor strongly favors approval of the record-breaking settlements.

### CONCLUSION

The Court accordingly (a) grants class certification pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and (b) concludes that the settlements are in the best interests of the Class and approves them pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.