**In re MARSH ERISA LITIGATION.**

No. 04 Civ. 8157(CM).

United States District Court, S.D. New York.

Jan. 29, 2010.

DECISION AND ORDER APPROVING THE CLASS ACTION SETTLEMENT; CERTIFYING THE CLASS FOR SETTLEMENT PURPOSES; APPROVING THE PLAN OF ALLOCATION; AWARDING ATTORNEYS' FEES AND EXPENSES; GRANTING CASE CONTRIBUTION AWARDS; AND REJECTING THE OBJECTIONS RECEIVED

McMAHON, District Judge.

## INTRODUCTION

Named Plaintiffs Donald Hundley, Conrad Simon and Leticia Hernandez ("Named Plaintiffs"), on behalf of themselves and the Class (as defined herein), move for (1) final approval of a proposed settlement of $35 million (the "Settlement") with Marsh & McLennan Companies, Inc. ("MMC") and the various other individuals and entities named as defendants in this consolidated litigation (collectively, "Defendants"); (2) certification of the Class for Settlement purposes; and (3) final approval of the Revised Plan of Allocation (the "Plan of Allocation").

The Court preliminarily approved the Settlement in its Preliminary Approval Order of November 10, 2009 (Docket No. 131.) Not one potential Class member objects to the amount of the proposed Settlement or to any of its terms; only two potential Class members have objected to the amount of attorneys' fees requested. For the reasons stated below, the Court approves the Settlement, concluding that it is fair, reasonable and adequate. The Court also certifies the Class for Settlement purposes and approves the Plan of Allocation.

In addition, Plaintiffs' Counsel [1] move for (1) an award of attorneys' fees in the amount of $11,665,500 (33.33% of the recovery); (2) reimbursement of litigation expenses of $1,270,915.40; and (3) case contribution awards of $15,000 for each of the Named Plaintiffs. For the reasons stated below, the Court grants all three requests.

---

1. Capitalized terms not otherwise defined herein have the meanings assigned to them in the Stipulation and Agreement of Settlement (the "Settlement Agreement") (Docket No. 128–2).

## BACKGROUND

### I. Summary of Plaintiffs' Claims

This litigation arises out of the underlying allegation that MMC engaged in a systematic plan to increase insurance placement revenues through improper bid manipulation and illicit client steering, all designed to generate a critical source of income known as "contingent commissions." Plaintiffs allege that Defendants violated their fiduciary and co-fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), by, inter alia: (1) failing to prudently and loyally manage the Marsh & McLennan Companies 401(k) Savings & Investment Plan (formerly the Marsh & McLennan Companies Stock Investment Plan or "SIP," herein referred to as the "Plan") and the Plan's assets; (2) failing to properly monitor the performance of their fiduciary appointees; and (3) failing to provide participants with complete and accurate information regarding the MMC Stock Fund. Plaintiffs claim that Defendants knew or should have known that the Plan's investment in MMC stock was not a prudent retirement investment during the Class Period, and that Defendants acted imprudently by continuing to hold MMC stock in the Plan.

### II. Procedural History

In 2004, numerous complaints were filed against MMC and the Plan's other fiduciaries. On February 9, 2005, Judge Kram consolidated those complaints into this action, styled *In re Marsh ERISA Litigation* (the "ERISA Action"). (Docket No. 17.) Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint") on June 21, 2005. (Docket No. 32.)

#### A. Coordination with the Securities Action

Judge Kram coordinated the schedules of this ERISA Action and *In re Marsh & McLennan Companies, Inc. Securities Litigation,* No. 04 Civ. 8144 (the "Securities Action"). Although the plaintiffs' interests in the two actions overlapped, they were far from identical. Extensive negotiation was required to reach an agreement all of plaintiffs' counsel could live with—and Judge Kram would accept. (Lead Counsel's Corrected Mem. in Supp. of Mot. for Award of Attorneys' Fees, Expenses and Case Contribution Awards, Dec. 30, 2009 ("Fees Mem."), at 3.) Ultimately, under the scheduling order adopted on April 18, 2007 (Docket No. 91), the ERISA and Securities Actions were to be litigated simultaneously, with the same motion deadlines and discovery timeline. Only the trial dates were different—the Securities Action would be tried first, with the ERISA Action (a bench trial) to follow a month later.

#### B. The Motions to Dismiss

Defendants vigorously contested Plaintiffs' allegations from the outset and, in September 2005, moved to dismiss the Complaint. The motions were fully briefed by January 2006. Eleven months later, Judge Kram ruled on the motions, denying them in most respects. (Docket No. 76.) Because the motions were under submission for such a long period of time, and because of the rapidly evolving law concerning ERISA fiduciary duty issues in the context of company stock in 401(k) plans, Plaintiffs supplemented their papers on six occasions. (Decl. of Lynn L. Sarko in Supp. of Mot. for Final Approval of Class Action Settlement, Settlement Class Cert. and Plan of Allocation and Mot. for Award of Attorneys' Fees, Expenses and Case Contribution Awards, Dec. 29, 2009 ("Sarko Decl."), ¶¶ 12–23.)

#### C. Class Certification

Following class document discovery, the three class representatives were deposed in Florida and Virginia in May and June 2008. Plaintiffs filed their motion for class certification on August 4, 2008, and briefing was complete in November 2008. Thereafter, both sides submitted several supplemental letter briefs, again reflecting the rapidly developing law in ERISA company stock litigation. (*See id.* ¶¶ 54–58.) The class certification motion was still pending at the time the proposed Settlement was reached.

#### D. Merits Discovery

Lead Counsel engaged in thirty-one months of merits discovery, which included

reviewing many millions of pages of documents and participating in about 100 depositions. (Fees Mem. at 4–6.) There were numerous discovery disputes, many of which involved motion practice. Judge Kram appointed a Special Master, L. Peter Parcher, to hear and rule on disputed discovery issues.

Lead Counsel describe the document discovery in this case as "all but overwhelming." (*Id.* at 4.) More than thirty million pages of documents were assimilated; the documents included not only ERISA-specific documents produced in this case, but all of the documents produced by MMC in the Securities Action. (*See* Sarko Decl. ¶¶ 29–42 (detailing massive document review effort).)

The depositions in this litigation were "extensive, exhaustive, and expensive." (Fees Mem. at 5.) All told, Lead Counsel led or participated in about 100 depositions: the three Named Plaintiffs; twenty of the thirty-three individual defendants; eight depositions of non-defendant Plan personnel or employees of Plan service providers; and another sixty to seventy depositions of witnesses where the Securities plaintiffs took the lead and ERISA Plaintiffs' Counsel questioned the witness at the end. (Sarko Decl. ¶¶ 43–48.) Lead Counsel, an experienced ERISA plaintiffs' firm, believes that, with "the possible exception of *Enron*, . . . it did more oral discovery in this case than in any other company stock case." (Fees Mem. at 6.)

Merits discovery concluded on September 25, 2009; however, expert discovery was still ongoing (and substantially completed) when the Settlement was reached. Plaintiffs' Counsel retained six ERISA experts, one expert on contingent commissions, and another on the factors that led to the drop in MMC's stock price. When the case settled, all expert reports and rebuttal reports had been submitted, and expert depositions had begun. (Sarko Decl. ¶¶ 49–52.)

### E. Settlement Negotiations and the Resulting Agreement

This Settlement is the product of hard-fought, arm's-length negotiations assisted by the experienced mediator and retired Judge of the Superior Court of California, Judge Daniel H. Weinstein. The parties attended one in-person mediation session and countless phone meetings with Judge Weinstein. In addition, Lead Counsel negotiated directly with MMC's General Counsel. Ultimately, the parties accepted Judge Weinstein's proposal, and in the days following engaged in extensive negotiations over the specific terms of the agreement. On November 9, 2009, the parties executed the Settlement Agreement. (*Id.* ¶¶ 60–64.)

This is a global Settlement—it releases all claims against Defendants and brings this litigation to a close. The amount of the Settlement is $35 million. The $35 million, minus attorneys' fees and expenses and certain other expenses described in paragraph 3.3 of the Settlement Agreement, will be directed to the accounts of Class members pursuant to the proposed Plan of Allocation.

### F. Preliminary Approval and Notice to the Class

In its November 10, 2009 Preliminary Approval Order, the Court preliminarily approved the Settlement Agreement, approved the form of Notice and scheduled the Fairness Hearing for January 29, 2010. Pursuant to that Order, Lead Counsel, through the Settlement Administrator, provided notice of the Settlement to Class members by (1) mailing the Court-approved Notice to the last known address of each Class member who could be identified with reasonable effort; (2) publishing the Publication Notice in the *The New York Times and on Business Wire;* and (3) creating and administering a website to provide current information to Class members. (*See* Sarko Decl. Ex. C (Aff. of Eric Schachter, Dec. 22, 2009 ("Schachter Aff.") (describing dissemination and publication of notice)).) Because the Class does not allow for opting out, all Class members will be eligible to receive a distribution from the Settlement regardless of their actual notice.

### G. Objections Received

More than 30,000 Class Notices were mailed. (*Id.* ¶ 8.) No Class members object to the Settlement itself. Only two object to the requested fee award.

## *DISCUSSION*

### I. The Settlement Is Fair, Reasonable and Adequate

 There is a "strong judicial policy in favor of settlements, particularly in the class action context." *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998). "Settlement approval is within the Court's discretion, which should be exercised in light of the general judicial policy favoring settlement." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y.1999) (internal quotations omitted). In a class action settlement, there is a presumption of fairness, reasonableness and adequacy when the settlement is the product of "arms-length negotiations between experienced, capable counsel after meaningful discovery." *Id.* at 280 (*citing Manual for Complex Litigation* (Third) § 30.42 (1995)).

### A. Standards for Approval of a Class Action Settlement

 In evaluating a proposed settlement under Federal Rule of Civil Procedure 23, the Court must determine whether the settlement, taken as a whole, is fair, reasonable and adequate. *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir.1995); *see In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004). It is well-established that courts in this Circuit examine the fairness, adequacy and reasonableness of a class action settlement according to the "*Grinnell* factors":

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974) (citations omitted). "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y.2004) (*quoting Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003)). In deciding whether to approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another." *White v. First Am. Registry, Inc.*, No. 04 Civ. 1611, 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007).

### B. Application of the *Grinnell* Factors Supports Approval of the Settlement

### 1. The Complexity, Expense and Likely Duration of the Litigation

 Many courts have recognized the complexity of ERISA breach of fiduciary duty company stock claims. In *In re WorldCom, Inc. ERISA Litigation*, No. 02 Civ. 4816, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004), Judge Cote noted that there is a "general risk inherent in litigating complex claims such as these to their conclusion."

This case, even more than many other ERISA class action cases, was enormous in scope and extremely complicated. Plaintiffs' breach of fiduciary duty claims revolve around the allegedly fraudulent business practices at one of the world's largest insurance brokers. It is not surprising that the case involves scores of witnesses, more than thirty million pages of documents and extensive expert discovery.

This Settlement cuts short the costly and time-consuming expert discovery that remains, and eliminates the time and expense of the substantial additional briefing that undoubtedly would occur going forward. Moreover, even if the Class were to win a judgment at trial, the additional delay of trial, post-trial motions and appeals could deny the Class any actual recovery for years, further

reducing its value. *See Strougo v. Bassini*, 258 F.Supp.2d 254, 261 (S.D.N.Y.2003).

Thus, the first *Grinnell* factor weighs in favor of approving the Settlement.

### 2. The Reaction of the Class to the Settlement

The Class's reaction to the Settlement also supports approval. Lead Counsel have kept the three Named Plaintiffs informed of the settlement negotiations with Defendants throughout the negotiating process, and all three Named Plaintiffs now fully support the Settlement. (Mem. in Supp. of Named Pls.' Mot. for Final Approval of Class Action Settlement, Settlement Class Cert. and Plan of Allocation, Dec. 29, 2009 ("Settlement Mem."), at 7.)

■ The Independent Fiduciary appointed to review the Settlement, Ms. Nell Hennessey of Fiduciary Counselors, also supports the Settlement. (Sarko Decl. Ex. B) (Report of the Independent Fiduciary for the Settlement of *In re Marsh ERISA Litigation*, Dec. 10, 2009 ("Independent Fiduciary Rpt.").) The Independent Fiduciary's approval is critically important. Under well-established ERISA law, an ERISA plan that gives a litigation release to a "party of interest," such as the company itself or its employees, engages in a prohibited transaction under ERISA § 406, 29 U.S.C. § 1106. In 2003, the Department of Labor ("DOL") promulgated a Prohibited Transaction Exemption permitting such releases, but only if an independent fiduciary approves the terms of the settlement that include the release. *See* Prohibited Transaction Exemption 2003–39, 68 Fed.Reg. 75632–01 (Dec. 31, 2003). In other words, the independent fiduciary must determine that the plan received fair value for the release. Ms. Hennessey has done so in this case.

■ Pursuant to the Court-approved notice plan, the Notice was mailed to more than 30,000 potential Class members, and the

Publication Notice was published in *The New York Times* and distributed via *Business Wire*. As set forth in the Preliminary Approval Order, the deadline for filing and serving objections was January 15, 2010. There has not been a single objection to the amount of the Settlement, to any of its terms, or to the adequacy of the Notice or Publication Notice.[2] The lack of any objections from Class members is an extremely strong indication that the Settlement is fair.

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

■ At the time of the Settlement, Plaintiffs' Counsel had reviewed millions of pages of documents, participated in 100 depositions, exchanged expert reports and rebuttal reports, and fully briefed the issue of class certification. The advanced stage of the litigation and extensive amount of discovery completed weigh heavily in favor of approval. The parties' counsel were clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and to evaluate the fairness of the proposed Settlement. *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *15 (S.D.N.Y. Nov. 26, 2002); *see also In re Sumitomo*, 189 F.R.D. at 281–82 (finding that the stage of the proceedings "strongly" favored approval of settlement reached after "[p]laintiffs had conducted extensive discovery, investigation and analyses, and the proceedings were in the advanced stage of pointing or preparing for trial"). This is not a case where the parties engaged only in "settlement discovery." Thus, the third *Grinnell* factor strongly supports approval.

### 4. The Risks of Establishing Liability

■ In assessing the Settlement, the Court balances the benefits afforded the Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation. *See Grinnell*, 495 F.2d at 463. Here, the Class would have faced many hur-

---

2. One potential Class member, Lois Waldvogel, "objected," but only in the sense that she was concerned that she was not permitted to share in the Settlement because she had executed a severance agreement with MMC when she left in 2004. (Pls.' Supplemental Mem. Concerning Ob-

jections, Jan. 22, 2010 ("Objections Mem."), Ex. A (Waldvogel Objection).) Lead Counsel discussed the matter with Ms. Waldvogel, explaining that the severance agreement is not a bar to her participation. (*Id.* at 3.) Ms. Waldvogel has withdrawn her objection. (*Id.* Ex. C.)

dles going forward—for example, achieving and maintaining class certification, avoiding summary judgment, proving liability and damages at trial and then preserving any favorable judgment on appeal.

■ Contributing to Plaintiffs' risk is the fact that ERISA company stock cases involving 401(k) plans are quite new—the pioneering cases in this field were not filed until the late 1990s. The results in these cases have been decidedly mixed. Some complaints have been dismissed on motion, while others have not. And relatively few such cases have made it to the summary judgment stage, let alone trial In those cases that have gone to trial or reached an appellate court, the results for plaintiffs have not, on balance, been favorable. Defendants surely would have raised a host of defenses as this action progressed, any one of which might have ended or significantly limited Plaintiffs' case.

In short, there exists a substantial risk that Plaintiffs ultimately might have failed to establish Defendants' liability, and that the Class would have received nothing at all. Accordingly, the Court finds that the fourth *Grinnell* factor weighs in favor of approving the Settlement.

### 5. The Risks of Establishing Damages

■ Establishing damages in this case would have been a complicated endeavor. The complex damages calculations in ERISA cases like this one are expert-intensive. The calculations require a computer model that tracks the plan's holdings of company stock, and is then compared with the performance of alternative investments on specified breach dates, subject to various additional factors and assumptions. Here, the parties have exchanged expert damages reports that reach widely divergent conclusions. (Settlement Mem. at 10.)

Moreover, the damages issue is uncertain because courts have not had occasion to apply a damages measure in a case like this after a trial. That uncertainty, coupled with Defendants' vigorous dispute of the damages issue, make establishing damages a risky proposition for Plaintiffs.

The presentation of expert testimony on complex damages issues inevitably creates

significant risks that Plaintiffs avoid with this Settlement. *See In re Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 54 (S.D.N.Y.1993) (approving settlement amounting to small percentage of total damages sought because magnitude of damages often becomes "battle of experts ... with no guarantee of the outcome"). Thus, the fifth *Grinnell* factor weighs in favor of approving the Settlement.

### 6. The Risk of Maintaining the Class Action Through Trial

■ There is also the risk that the Court would have denied Named Plaintiffs' motion for class certification on certain or all of their claims, thereby limiting or even precluding any possible recovery for the Class. The class certification motion was pending before the Court at the time of the Settlement. Thus, the uncertainty surrounding class certification supports approval of the Settlement. *See In re AOL Time Warner, Inc.*, No. 02 Civ. 5575, 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) (finding that risk of plaintiffs not succeeding in certifying class supported approval of settlement); *In re Global Crossing*, 225 F.R.D. at 460 (same).

### 7. The Ability of Defendants to Withstand a Greater Judgment

■ It is undeniable that the current economic climate is not strong. MMC's financial condition undoubtedly has been adversely affected by the economic turmoil of the past year. Moreover, the value of MMC stock has not recovered since the alleged wrongdoing giving rise to this litigation. Accordingly, there is at least some risk that MMC would not have been able to pay an award higher than the Settlement. The Court agrees with Lead Counsel, however, that any such risk is remote. (*See* Settlement Mem. at 12 ("Accordingly, this factor was not a focus of the settlement negotiations.").) Thus, the seventh *Grinnell* factor is neutral or, if anything, weighs slightly in favor of approval.

### 8. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

■ The determination of a "reasonable" settlement "is not susceptible of a

mathematical equation yielding a particularized sum." *In re Milken,* 150 F.R.D. at 66; *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 718 F.Supp. 1099, 1103 (S.D.N.Y.1989). Rather, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell,* 495 F.2d at 455 & n. 2 ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.")

■ This Settlement is well within the range of reasonableness. Several factors dictated a relatively wide range of potentially recoverable damages in this case. For example, one significant factor would have been the Court's determination of the "breach" date—that is, the date on which Defendants knew or should have known that MMC stock was an imprudent investment for participants' retirement assets. Plaintiffs allege that MMC common stock was an imprudent investment for the Plan from the beginning of the Class Period, and that losses to the Plan therefore should be calculated from July 1, 2000 to January 31, 2005. Defendants almost certainly would have attempted to establish a breach date far later in the Class Period.

In addition, the amount of any recovery would have depended on various other circumstances and determinations, such as the possibility that MMC's stock price would increase, causing the Plan's losses to decrease accordingly; the Court's decision as to which measure to use when calculating damages; and the Court's determination as to whether "holder" losses are available.

In sum, the $35 million Settlement falls squarely within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation. The final two *Grinnell* factors therefore weigh in favor of approving the Settlement.

## C. The Proposed Settlement Is Procedurally Fair

■ "In addition to ensuring the substantive fairness of the settlement through full consideration of the *Grinnell* factors, the Court must also 'ensure that the settlement is not the product of collusion.'" *In re Global Crossing,* 225 F.R.D. at 461 (*quoting In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 474 (S.D.N.Y.1998)). However, "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." *Banyai v. Mazur,* No. 00 Civ. 9806, 2007 WL 927583, at *12 (S.D.N.Y. Mar.27, 2007) (approving settlement reached after months of good-faith, arm's-length negotiations) (*quoting In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 132 (S.D.N.Y.1997)).

■ Where, as here, "the settlement is the result of arm's length negotiations conducted by experienced counsel after adequate discovery and the settlement provokes only minimal objections, then it is entitled to '[a] strong initial presumption of fairness.'" *In re Global Crossing,* 225 F.R.D. at 461 (citation omitted). As set forth in the Sarko Declaration, this Settlement is the product of a rigorous and adversarial process.

Moreover, the negotiations were conducted with the assistance of Judge Weinstein, a highly regarded mediator with extensive experience in complex ERISA breach of fiduciary duty class actions. Judge Weinstein has submitted a declaration in strong support of the Settlement. (*See* Decl. of Hon. Daniel H. Weinstein in Supp. of Mot. for Final Approval of Class Action Settlement, Jan. 20, 2010, ¶¶ 17–18 ("[B]ased on my knowledge of this action, all of the materials provided to me, the efforts of counsel, the intensity of the negotiations, the litigation risks, and the benefits reached in the proposed settlement, I believe that this is a fair, reasonable and adequate settlement ..., and I respectfully recommend that it be approved by the District Court.").) In light of the foregoing, the Court has no reason to doubt that the Settlement is procedurally fair.

## II. Certification of a Settlement Class Is Appropriate Under Rule 23

The Preliminary Approval Order preliminarily certified the following Class:

(a) all current and former participants and beneficiaries of the Plan whose individual Plan account(s) included investments in MMC stock at any time during the Class Period and (b) as to each Person within the scope of subsection (a) of this, his, her or its beneficiaries, alternate payees (including spouses of deceased Persons who were participants of the Plan), Representatives and Successors–In–Interest, provided, however, that the Class shall not include any Defendant or any of their Immediate Family, beneficiaries, alternate payees (including spouses of deceased Persons who were Plan participants), Representatives or Successors–In–Interest, except for spouses and immediate family members who themselves are or were participants in the Plan, who shall be considered members of the Class with respect to their own Plan accounts.

(Prelim. Approval Order at 3.) The Court also appointed the three Named Plaintiffs as Class Representatives and Keller Rohrback L.L.P. as Lead Counsel for the Class. (*Id.* at 4.)

 The Second Circuit has long acknowledged the propriety of certifying a class solely for purposes of a class action settlement. *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982). Classes certified for settlement purposes, like all other classes, must meet the requirements of Rule 23(a) and at least one of three requirements set forth in Rule 23(b). *See In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 205–10 (S.D.N.Y.1995).

 Here, Plaintiffs' ERISA breach of fiduciary duty claims are particularly appropriate for class certification. *See, e.g., In re WorldCom, Inc. ERISA Litig.,* No. 02 Civ. 4816, 2004 WL 2211664, at *3 (S.D.N.Y. Oct. 4, 2004) (certifying for class treatment similar ERISA claims). Indeed, the Advisory Committee Notes to the 1966 Amendment of Rule 23(b)(1)(B) specifically state that certification is especially appropriate in cases charging breach of trust by a fiduciary to a large class of beneficiaries. Moreover, Congress has embraced the principle that ERISA "actions for breach of fiduciary duty [should] be brought in a representative capacity on behalf of the plan as a whole." *See Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142 n. 9, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Moreover, in the class certification briefing in this case, Defendants did not object to certification of Plaintiffs' prudence claims. (*See* Defs.' Opp. to Mot. for Class Cert., Sept. 18, 2008, at 1.)

### A. The Requirements of Rule 23(a) Are Satisfied

Certification under Rule 23(a) is proper if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately protect the interests of the class.

### 1. The Settlement Class Is Sufficiently Numerous

 Numerosity is generally presumed when a class consists of forty or more members. *See Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). The proposed Class numbers in the thousands, easily meeting the numerosity requirement.

### 2. There Are Questions of Law or Fact Common to the Class

 Rule 23(a)(2) requires a showing that common issues of fact or law affect all Class members. Commonality does not demand that every question of law or fact be common to every class member, but instead merely requires that the claims arise from a common nucleus of operative facts. *See Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.").

By their very nature, ERISA actions often present common questions of law and fact, and are therefore frequently certified as

class actions. "In general, the question of defendants' liability for ERISA violations is common to all class members because a breach of a fiduciary duty affects all participants and beneficiaries." *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y.2002).

■ There are several common questions in this case with respect to each Class member, including (1) whether Defendants were fiduciaries of the Plan; (2) whether Defendants breached their fiduciary duties; (3) whether the Plan and its participants and beneficiaries were injured by Defendants' breaches; and (4) whether the Class is entitled to damages and, if so, the proper measure of damages. These common questions satisfy Plaintiffs' burden under Rule 23(a)(2).

**3. Named Plaintiffs' Claims Are Typical of Those of the Class**

■ Rule 23(a)(3) requires that the class representatives' claims are "typical" of those of the class. The typicality requirement does not require that all of the putative class members' claims are identical. *E.E.O.C. v. Local 638*, No. 71 Civ. 2877, 2004 WL 2414013, at *5 (S.D.N.Y. Oct. 28, 2004). Rather, "the focus of the typicality inquiry concerns whether 'each class member's claim arises from the same course of events, and [whether] each class member makes similar legal arguments to prove the defendant's liability.'" *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y.2001) (citation omitted). The typicality requirement is often met in putative class actions brought for breaches of fiduciary duty under ERISA. *See e.g., Koch v. Dwyer*, No. 98 Civ. 5519, 2001 WL 289972, at *3 (S.D.N.Y. Mar.23, 2001).

■ In this case, Named Plaintiffs' claims—for Defendants' alleged breach of their duties to the Plan and to all Plan participants whose accounts held MMC stock—are typical of the Class's claims, as all of the claims are effectively the same unitary claim asserted on behalf of the same Plan. In short, Named Plaintiffs and the absent Class members seek the same relief for the same wrongs by the same Defendants. According-ly, Rule 23(a)(3)'s typicality requirement is met.

**4. Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**

■ Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Courts consider two factors in measuring adequacy of representation: (1) whether the claims of the lead plaintiffs conflict with those of the class; and (2) whether the lead plaintiffs' counsel is qualified, experienced and generally able to conduct the litigation. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992); *In re Oxford Health Plans*, 191 F.R.D. 369, 376 (S.D.N.Y.2000). As many courts have observed, "the issues of typicality and adequacy tend to merge because they 'serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y.2007) (*quoting Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

■ First, Named Plaintiffs' claims and interests are aligned with those of the Class, as they are all seeking to prove Defendants' liability based on common facts and claims. Moreover, where, as here, Named Plaintiffs and absent Class members share the common goal of maximizing recovery, there is no conflict of interest between them. *See In re Drexel Burnham Lambert*, 960 F.2d at 291.

Second, Named Plaintiffs' counsel are highly qualified and experienced in this type of litigation, and undoubtedly capable of prosecuting this action to adequately protect the interests of the Class. (*See* Sarko Decl. ¶¶ 112, 143–50.) Accordingly, Named Plaintiffs and Lead Counsel meet the requirements of Rule 23(a)(4).

**B. The Requirements of Rule 23(b)(1) Are Satisfied**

To satisfy Rule 23(b)(1), Named Plaintiffs must show that the prosecution of separate

actions would create either (A) the risk of "inconsistent or varying adjudications with respect to individual class members," Fed. R.Civ.P. 23(b)(1)(A), or (B) the risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests," Fed.R.Civ.P. 23(b)(1)(B).

■ In this case, any one participant's claim would, as a practical matter, be dispositive of the interests of fellow Plan members because § 502(a)(2) claims must be brought in a representative capacity on behalf of the entire plan, and the relief granted by the Court to remedy a breach of fiduciary duty would "inure[ ] to the benefit of the plan as a whole," not to the individual plaintiff. *See Russell*, 473 U.S. at 140, 105 S.Ct. 3085. Here, the three Named Plaintiffs were participants in the Plan during the Class Period. Consequently, the claims of each Named Plaintiff would be dispositive of the claims of the other Class members. Additionally, where, as here, "the allegations in the Complaint implicate misconduct in the management in the Plan[s] as a whole, disparate lawsuits by individual participants would raise the specter of 'varying adjudications.'" *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 78 (S.D.N.Y.2006).

Courts considering whether to certify ERISA breach of fiduciary duty claims have consistently followed the reasoning of the drafters of the Federal Rules of Civil Procedure in concluding that subsection 23(b)(1)(B) is the most appropriate basis for class certification. *See* Fed.R.Civ.P. 23(b)(1)(B) adv. comm. note, 1966 amend. (stating that certification under 23(b)(1)(B) is appropriate in cases charging breach of trust by a fiduciary to a large class of beneficiaries); *see, e.g., AOL Time Warner ERISA Litigation*, No. 02 Civ. 8853, 2006 WL 2789862, at *3 (S.D.N.Y. Sept. 27, 2006); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y.2004). Certification of the Class as a non-opt-out class under Rule 23(b)(1)(B) is therefore appropriate.

## C. The Requirements of Rule 23(g) Are Met

■ Finally, the requirements of Rule 23(g) are met because Lead Counsel will provide adequate representation to the Class. Lead Counsel include some of the preeminent ERISA class action attorneys in the country, with many years of experience in ERISA law and in litigating complex actions. There is no question that Lead Counsel have effectively prosecuted this action. They prepared a detailed and thorough Complaint, responded to multiple motions to dismiss, moved for class certification, conducted extensive discovery, consulted with numerous experts and exchanged expert reports with Defendants, and engaged in hard-fought and ultimately successful settlement negotiations with Defendants. Lead Counsel's efforts in prosecuting this case, together with their background and experience in ERISA class action litigation, satisfy the requirements of Rule 23(g).

## III. Transmission of the Notice to the Class Satisfied Both the Preliminary Approval Order and Applicable Law

In accordance with the Preliminary Approval Order, the Class has been provided with ample and sufficient notice of this Settlement, and has been afforded an appropriate opportunity to voice objections. The notice plan fully informed Class members of the lawsuit and proposed Settlement, and enabled them to make informed decisions about their rights.

■ To satisfy due process, notice to class members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y.1996) (*quoting Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)), *aff'd*, 107 F.3d 3 (2d Cir.1996). To satisfy Rule 23, "For non-opt out cases, such as the ERISA Actions, [all that is required is] such unspecified 'appropriate notice' as 'the court may direct.'" *In re Global Crossing Sec. &*

*ERISA Litig.*, 225 F.R.D. 436, 448 (S.D.N.Y. 2004) (*quoting* Fed.R.Civ.P. 23(c)(2)(A)).

██ Here, the forms and methods of notice of the proposed Settlement satisfy due process considerations and meet the requirements of Rule 23. The notice plan, as approved by the Court and implemented by Lead Counsel, consisted of (1) mailing the Class Notice on December 8, 2009 to more than 30,000 potential Class members at their last known addresses; (2) publishing the Publication Notice in *The New York Times* and distributing it via *Business Wire;* (3) creating and administering a website to provide information to Class members; and (4) providing a toll-free telephone number that participants can call (and have called) to obtain information about the Settlement. (*See* Sarko Decl. ¶ 74; Schachter Aff.)

The Notice mailed to potential Class members provided important information regarding the proposed Settlement, including (1) a comprehensive summary of its terms; (2) notice of Lead Counsel's intent to request attorneys' fees, reimbursement of expenses and case contribution awards; and (3) detailed information about the Released Claims. In addition, the Class Notice provided information about the Fairness Hearing (including its date and time), Class members' rights to object (and deadlines and procedures for objecting), and the procedure to follow to receive additional information. Further, the Notice gave Class members contact information for Lead Counsel, the toll-free phone number and an email address for inquiries, and a website for further information. The Publication Notice summarized the above information for purposes of publication.

The notice forms and methods employed here are substantially similar to those successfully used in many previous ERISA class settlements. They "fairly, accurately, and neutrally describe the claims and parties in the litigation as well as the terms of the proposed settlement and the identity of persons entitled to participate in it." *Foe v. Cuomo*, 700 F.Supp. 107, 113 (E.D.N.Y.1988), *aff'd*, 892 F.2d 196 (2d Cir.1989). Accordingly, the notice provided to the Class satisfies due process and Rule 23.

## IV. The Plan of Allocation Is Reasonable, Fair and Equitable

██ A district court has broad supervisory powers with respect to allocating a class action settlement and wide latitude in determining what to consider in approving a settlement allocation. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir.1987). "When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational basis.'" *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (*quoting In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001)). In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel. *See In re PaineWebber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y.1997).

██ Here, the Plan of Allocation was designed by experienced Lead Counsel who have prepared similar plans for numerous other cases. It provides recovery to Class members, net of administrative expenses and attorneys' fees and expenses, on a pro rata basis.

The Plan of Allocation was described in the Notice approved by the Court and mailed to Class members. As stated in the Notice, the Net Settlement Fund will be allocated to Class members on a pro rata basis such that the amount received by each Class member will depend on his or her calculated loss—relative to the losses of other Class members—related to the Plan's investments in MMC stock.

Payments will be made by crediting the accounts of active Plan participants with the appropriate amount, and by creating or re-creating an account for Class members who are no longer active participants and then crediting their accounts in the same manner. This is substantially the same methodology used in other company stock ERISA cases in which the private litigants were joined by the DOL as plaintiffs. In those cases, the methodology was employed without objection from the DOL or any independent fiduciary, and

146

was approved by the court. *See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02 Civ. 5575, 2006 WL 903236, at *17 (S.D.N.Y. Apr. 6, 2006). Here, Lead Counsel has not received a single objection to the proposed Plan of Allocation.

The proposed Plan of Allocation also provides for the appointment of a Settlement Administrator, who will perform the allocation calculation described in the Plan of Allocation, "shall be responsible for administering the Settlement pursuant to the requirements of ERISA and any other applicable law or regulation, and shall be a fiduciary under ERISA with respect to such action." (Plan of Allocation ¶ 8.) Lead Counsel have selected A.B. Data, Ltd., an experienced settlement administrator in complex class action litigation like this, to serve as Settlement Administrator.

For the reasons set forth above, the Court concludes that the proposed Plan of Allocation is fair, reasonable and equitable, and that it is not unduly complicated or expensive. Accordingly, the Court approves the Plan of Allocation.

## V. Attorneys' Fees

Lead Counsel move for (1) an award of attorneys' fees in the amount of $11,665,500 (33.33% of the recovery); (2) reimbursement of litigation expenses of $1,270,915.40; and (3) case contribution awards of $15,000 for each of the Named Plaintiffs. For the reasons set forth below, the Court grants all three requests.

### A. Lead Counsel Are Entitled to an Award of Attorneys' Fees from the Settlement Fund

■ When attorneys create a settlement fund for the common benefit of members of a class, "the attorneys whose efforts created the fund are entitled to a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir.2000) (*citing Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980)). "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefiting from a lawsuit without contributing to its cost." *Id.*

Common fund fee awards are therefore a common feature of class litigation. Here, Plaintiffs' Counsel successfully created a common fund of $35 million plus interest, and accordingly are entitled to a reasonable share of that fund as compensation for their work. *See In re Telik, Inc. Sec. Litig.*, 576 F.Supp.2d 570, 584–85 (S.D.N.Y.2008).

■ The Second Circuit approves two ways of determining a reasonable attorney's fee in common fund cases: the "percentage" method and the "lodestar" method. Under the percentage method, the fee is calculated simply as a percentage of the recovery. Under the "lodestar" method, the court determines the lodestar—that is, the number of hours reasonably expended on the case multiplied by the appropriate hourly rates—based on submissions from counsel regarding the work they performed. This lodestar is then adjusted, usually upward (by a "multiplier"), to arrive at the appropriate fee award for the case. *See Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *Goldberger*, 209 F.3d at 50.

■ A district court has discretion to use either method, although the trend in this Circuit is toward the percentage method. *See Wal–Mart*, 396 F.3d at 121. Regardless of which method is used, several factors identified by the Second Circuit in *Goldberger* (the "*Goldberger* factors"), discussed below, ultimately determine what is a reasonable fee. *Masters v. Wilhelmina Model Agency*, 473 F.3d 423, 436 (2d Cir.2007).

As detailed in the Sarko Declaration, Plaintiffs' Counsel have invested about 45,000 hours in this case. The rates range from $125 for certain administrative personnel to $775 for the most senior lawyers; the blended rate for the case as a whole is less than $300. The lodestar (as of December 29, 2009) is $13,311,054.80. (Sarko Decl. ¶¶ 124–28.) The Court is satisfied that the lodestar is reasonable. The fee requested ($11,665,-500) is significantly less than the lodestar, which strongly suggests that the requested fee is reasonable.

When expressed as a percentage of the recovery—33.33%—the requested fee is rea-

sonable under the circumstances of this case, consistent with the *Goldberger* factors.

### B. The Fee Application Is Reasonable Under the *Goldberger* Factors

 The *Goldberger* factors are:

(1) "the time and labor expended by counsel";

(2) "the magnitude and complexities of the litigation";

(3) "the risk of the litigation";

(4) "the quality of the representation";

(5) "the requested fee in relation to the settlement"; and

(6) "public policy considerations."

209 F.3d at 50 (internal quotations omitted); *see also In re WorldCom, Inc. ERISA Litig.,* No. 02 Civ. 4816, 2005 WL 3116188, at *7 (S.D.N.Y. Nov. 22, 2005).

In approving the ERISA and securities settlements in *In re Global Crossing Securities & ERISA Litigation,* Judge Lynch observed that "the Second Circuit [in *Goldberger*] has identified the risk of success as perhaps the foremost factor to be considered in determining a reasonable award of attorneys' fees." 225 F.R.D. 436, 467 (S.D.N.Y. 2004) (internal quotations omitted). Because that factor is particularly important in this case, the Court addresses it first, and then turns to the other *Goldberger* factors.

### 1. The Risks of the Litigation Support the Requested Fee

 Risk is not uniform in all class actions. For example, in *Goldberger* itself the panel noted that some securities fraud class actions are, in truth, really not that risky. *See* 209 F.3d at 52. Particularly when there has been a large accounting restatement, government enforcement action or criminal prosecution, it can be argued that plaintiffs have a strong likelihood of securing a substantial settlement. The same argument an be made with respect to certain antitrust class actions filed in the wake of a Department of Justice consent decree, or products-liability cases filed shortly after a government-ordered recall. These cases all have risk, the argument goes, but the risk is limited.

That argument does not apply to ERISA class actions like this one. There is, for example, a sharp contrast between ERISA and securities fraud class actions. On the securities side, the securities laws have been around for more than seventy-five years; securities fraud class actions have been litigated since at least the early 1940s, *see, e.g., Deckert v. Indep. Shares Corp.,* 39 F.Supp. 592 (E.D.Pa.1941); there is a large body of appellate case law on the issues that arise over and over in securities fraud class actions; and, over the years, tens of billions of dollars have been paid in securities fraud settlements and judgments, yielding meaningful comparison cases to guide settlement discussions and enable parties to assess litigation risk.

Company stock fiduciary litigation provides a stark contrast. ERISA is a relatively new statute (1974), and the laws creating 401(k) plans are even newer (1981). Company stock actions involving 401(k) plans are newer still. The first cases in this field were not filed until the late 1990s, only several years before this case was filed. ERISA case law remains thin in comparison to securities and antitrust jurisprudence. There have been some substantial settlements, but nothing to rival those in the securities field. In short, ERISA litigation has nothing like the mature body of law and practice present in the securities and antitrust fields.

Further, ERISA law is still developing. One reason is the newness of the statute, but it is also true that ERISA was designed primarily to regulate traditional defined benefit plans, as opposed to 401(k) plans, which did not even exist when ERISA was enacted. The unsettled nature of the law applicable to Plaintiffs' claims—especially as it existed more than five years ago when this case was filed—increases the risks for Plaintiffs' Counsel.

Because this case settled before the summary judgment stage, it is impossible to know precisely what defenses Defendants would have asserted. However, it seems almost certain that they would have argued that MMC stock was a mandatory feature of the Plan—a feature that the defendant fiduciaries had no power to remove or restrict—

such that Defendants were not fiduciaries as to company stock and could not be liable. While that argument has been rejected by some courts, it was recently accepted by Judge Stein of this court in a well-reasoned opinion, *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708 (S.D.N.Y. Aug.31, 2009). Were this Court to have reached the same conclusion as Judge Stein (which would have depended on many factors, including but not limited to any dissimilarities in the facts of the cases), it would have had to dismiss Plaintiffs' case.

Defendants also likely would have argued that the fiduciaries were shielded from liability by ERISA § 404(c), 29 U.S.C. § 1104(c), which provides a defense in certain cases for fiduciaries of individual account plans; that steering and bid-rigging were never widespread in the company such that MMC stock was never imprudent; and that even if the stock were imprudent, the Plan suffered no loss (because other equity investments in the Plan also fared badly). These potential arguments created substantial litigation risk for Plaintiffs' counsel.

In sum, the risk for Plaintiffs' Counsel in this ERISA company stock case was significant. Moreover, in addition to the risks discussed above, Plaintiffs' Counsel had to contend with the traditional risks inherent in any contingent litigation. Lead Counsel accepted this case on a contingent basis, with the attendant risk that they would receive nothing at all. There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk. *Cf. Blum v. Stenson*, 465 U.S. 886, 902, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (Brennan, J., concurring) ("[T]he risk of not prevailing, and therefore the risk of not receiving any attorney's fees, is a proper basis on which a district court may award an upward adjustment to an otherwise compensatory fee."); *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir.1998) ("Because they shift part of the risk of loss from client to lawyer, contingent-fee contracts usually yield a larger fee in a successful case than an hourly fee would."). The risk factor, then, strongly supports the requested fee.

## 2. Lead Counsel's Time and Labor and the Magnitude and Complexities of this Case Support the Requested Fee

█ As detailed in the Sarko Declaration, and as discussed at various points above, this is a complex case both legally and factually, and Plaintiffs' Counsel have dedicated an enormous amount of time and labor to prosecuting this case since it was filed more than five years ago. Thus, these *Goldberger* factors also support the requested fee.

## 3. The Quality of Plaintiffs' Counsel's Representation of the Class Supports the Requested Fee

█ Lead Counsel are national leaders in this type of litigation. Keller Rohrback has served as lead or co-lead counsel in numerous ERISA fiduciary breach cases, including, in this District alone, the *WorldCom, Polaroid* and *Merrill Lynch* cases. (Sarko Decl. ¶¶ 145–46.) As lead or co-lead counsel, it has recovered over $900 million in company stock litigation. (*Id.* ¶ 145.)

Izard Nobel and Cohen Milstein, two other members of the Executive Committee representing Plaintiffs, also have extensive experience in this type of litigation, including many cases in which they have served together as co-lead counsel. Labaton Sucharow, an Executive Committee member and liaison counsel, has a strong and well-deserved reputation for representing plaintiffs in complex class litigation. (Fees Mem. at 15–16.)

The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement. The O'Melveny & Myers ERISA group, headed by Robert Eccles, is an unquestioned national leader in ERISA fiduciary breach litigation. The ability of Plaintiffs' Counsel to obtain a favorable settlement for the Class in the face of such formidable legal opposition confirms the quality of their representation of the Class.

Accordingly, the Court finds that this *Goldberger* factor weighs in favor of approving the requested fee award.

### 4. The Fee Request Is Fair and Reasonable in Relation to the Settlement Amount

█ The requested fee of $11,665,500 represents one-third of the recovery and about 87.6% of the lodestar. It is fair and reasonable in relation to the recovery and compares favorably to fee awards in other risky common fund cases in this Circuit and elsewhere.

In *Wal–Mart*, the Second Circuit stated that "the percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement." 396 F.3d at 96 (*quoting In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003)). Several decisions in this District have applied this principle. *See, e.g., Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 351 (S.D.N.Y.2005); *In re AOL Time Warner Sec. Litig.*, No. 02 Civ. 5575, 2006 WL 3057232, at *13 (S.D.N.Y. Oct 25, 2006). The empirical data attests that federal courts do, in fact, award larger percentage fees in smaller recoveries and smaller percentage fees in larger recoveries. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Stud. 27 (2004).

In light of this sliding-scale approach, the fee requested by Plaintiffs' Counsel is reasonable, and well within the range of awards made by district courts in this Circuit. In *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 749 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir.1986), the court noted that "Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%–50% range in class actions."

Many non-ERISA cases in this Circuit have awarded percentage fees equal to or greater than that requested here. *E.g., Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 188–89 (W.D.N.Y.2005) (awarding 38.26%); *Strougo v. Bassini*, 258 F.Supp.2d 254, 262 (S.D.N.Y.2003) (33.33%); *Maley v. Del Global Tech. Corp.*, 186 F.Supp.2d 358, 370–71 (S.D.N.Y.2002) (awarding 33.33%; noting "modest multiplier of 4.65 [was] fair and reasonable"); *Becher v. Long Island Lighting Co.*, 64 F.Supp.2d 174, 182 (E.D.N.Y.1999) (33.33%); *In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 326 (E.D.N.Y. 1993) (33.8%).

Courts have also awarded percentage fees of one-third or higher in ERISA company stock cases in appropriate circumstances, and especially when, as here, the fund is not a "mega" recovery. For example, in the *EDS* ERISA litigation, the settlement was "only" $12.5 million. The court awarded the requested one-third fee, taking into account, among other things, that the awarded fee was only 70% of the lodestar. *See In re EDS ERISA Litig.*, No. 03 Civ. 126, Order (E.D.Tex. Aug. 6, 2008). Further, in many ERISA company stock cases, courts have awarded fees of 30%, which yielded multipliers of over 1.0, and in some cases well over. *E.g., In re AIG ERISA Litig.*, No. 04 Civ. 9387, Order (S.D.N.Y. Oct. 7, 2008) (30% fee of $24.2 million; 1.1 multiplier); *In re Xerox Corp. ERISA Litig.*, No. 02 Civ. 1138, Order (D.Conn. Apr. 14, 2009) (30% fee of $51.0 million; 1.6 multiplier); *In re Household Int'l ERISA Litig.*, No. 02 Civ. 7921, Minute Entry Order (N.D.Ill. Nov. 22, 2004) (30% fee of $46.5 million; 4.8 multiplier); *Kling v. Fidelity Mgmt. Trust Co.*, No. 01 Civ. 11939, Order (D. Mass. June 29, 2006) (30% fee of $10.85 million; 1.3 multiplier); *In re Westar Energy ERISA Litig.*, No. 03 Civ. 4032, Order & Final Judgment (D.Kan. July 27, 2006) (30% fee of $9.25 million; 1.9 multiplier). In some ERISA company stock cases, courts have awarded fees well over these percentages. *See, e.g., Kolar v. Rite–Aid*, No. 01 Civ. 1229, 2003 WL 1257272, 2003 U.S. Dist. LEXIS 3646 (E.D.Pa. Mar. 11, 2003) (49% of monetary recovery; 2.5 multiplier).

Of course, all of these numerical comparisons, while helpful, only take the Court so far. Ultimately, the subjective factors discussed above—and especially the risk present in this litigation—are the heart of the analysis. Based on those factors, and in light of the comparative data from other cases, a 33.33% fee, yielding a below-lodestar recovery, is well warranted here.

### 5. Public Policy Supports Granting the Requested Fee Award

█ Congress passed ERISA to promote the important goals of protecting and pre-

serving the retirement savings of American workers. The ERISA statute itself specifically encourages private enforcement. *See, e.g.,* ERISA § 502(a), 29 U.S.C. § 1132(a). The Supreme Court has noted (in the context of securities class actions) that private actions provide "a most effective weapon in the enforcement" of federal statutes that provide for both governmental and private rights of action. *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (*quoting J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)).

Particularly in the securities context, courts "have recognized the importance that fair and reasonable fee awards have in encouraging private attorneys to prosecute class actions on a contingent basis ... on behalf of those who otherwise could not afford to prosecute." *Maley,* 186 F.Supp.2d at 373; *see Eltman v. Grandma Lee's, Inc.,* No. 82 Civ.1912, 1986 WL 53400, at *9 (E.D.N.Y. May 28, 1986) ("To make certain that the public [interest] is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.") (internal quotations omitted); *Spann v. AOL Time Warner Inc.,* No. 02 Civ. 8238, 2005 WL 1330937, at *3, 9 (S.D.N.Y. June 7, 2005) (awarding 33.33% fee in ERISA fiduciary breach case; noting that such lawsuits create incentives for fiduciaries to comply with ERISA).

In this case, the DOL took no action against Defendants. Without the efforts of Plaintiffs' Counsel, the participants in MMC's Plan would not have obtained any relief at all. They should receive a reasonable attorney's fee for their efforts. Thus, this *Goldberger* factor, like the others, supports awarding the requested fee.

## VI. The Expenses Incurred by Lead Counsel Were Reasonable and Necessary to the Effective Prosecution of this Action

█ It is well-established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses. *See In re Veeco Instruments Inc. Sec. Litig.,* No. 05 Civ. 01695, 2007 WL 4115808, at *10 (S.D.N.Y. Nov. 7, 2007). The expenses that may be reimbursed from the common fund encompass "all reasonable" litigation-related expenses. *See Trustees v. Greenough,* 105 U.S. 527, 533, 26 L.Ed. 1157 (1882).

Litigating complex contingent cases such as this one requires counsel to incur significant expenses. Plaintiffs' Counsel have advanced $1,270,915.40 (Sarko Decl. ¶¶ 159–60), and they are entitled to reimbursement of those expenses, *see Miltland Raleigh–Durham v. Myers,* 840 F.Supp. 235, 239 (S.D.N.Y.1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients."). Because Plaintiffs' Counsel was proceeding on a contingent-fee basis, they had a strong incentive to keep expenses at a reasonable level, and the Court concludes that they did so. The expenses incurred by Plaintiffs' Counsel are itemized in detail in the Sarko Declaration, and are largely attributable to ordinary and necessary costs such as court reporters, expert fees, computer-assisted document organization, travel and copying.

The Court finds that the expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the effective prosecution of this action. Accordingly, the Court orders reimbursement of expenses in the amount of $1,270,915.40.

## VII. Named Plaintiffs Are Entitled to the Requested Case Contribution Awards

Case law in this and other circuits fully supports compensating class representatives for their work on behalf of the class, which has benefited from their representation. *See, e.g., Dornberger v. Metro. Life Ins. Co.,* 203 F.R.D. 118, 124–25 (S.D.N.Y.2001). Such awards are compensatory in nature, reimbursing class representatives who "take on a variety of risks and tasks when they commence representative actions, such as complying with discovery requests and often must appear as witnesses in the action." *Strougo v. Bassini,* 258 F.Supp.2d 254, 264 (S.D.N.Y.2003) (granting award of $15,000 to class representative). In this case, the three

Named Plaintiffs request modest case contribution awards of $15,000 each.

 Named Plaintiffs Mr. Hundley, Mr. Simon and Ms. Hernandez have been active, hands-on participants in this litigation, expending significant amounts of their own time to benefit the Class. They came forward to initiate this action, and thereafter remained in frequent contact with Plaintiffs' Counsel. (Fees Mem. at 21.) They responded to document requests and interrogatories; reviewed and approved pleadings; assisted with discovery; and were involved in settlement discussions. (*Id.*) They prepared for, traveled to and sat for full-day depositions. (*Id.*) All of this can be unpleasant for people inexperienced in litigation. The Court easily concludes that Mr. Hundley, Mr. Simon and Ms. Hernandez should be compensated for their efforts on behalf of the Class, which has benefited greatly from their representation.

Accordingly, the Court grants case contribution awards in the amount of $15,000 to each of the three Named Plaintiffs.

## VIII. The Two Objections to Attorneys' Fees and Expenses Are Rejected

Notice was provided to more than 30,000 potential Class members, and only two objections have been lodged to the requested award of fees and expenses. The first objection was filed by William H. McIntyre, a retired MMC employee. (*See* Sarko Decl. Ex. A (McIntyre Objection).) Mr. McIntyre states that fees "should not simply be a flat percentage, but rather determined on a more reasonable decrimental [sic] scale to be in closer alignment with actual professional services rendered." (*Id.*) Plainly, Mr. McIntyre presumes that the fee requested exceeds the value of the "actual professional services rendered." As the Court has explained above, it does not. In fact, the lodestar in this case is above the requested fee. Thus, Mr. McIntyre's objection is rejected.

The other objection was filed by Anthony Meerpohl, another former MMC employee. (*See* Objections Mem. Ex. D (Meerpohl Objection).) Mr. Meerpohl objects to both the requested fees and expenses (he does not object to the case contribution awards). Mr.

Meerpohl's objection is less an objection to this case than to class litigation in general. Mr. Meerpohl asserts that "the fact that any Attorney can get both expenses that they generated without oversight other than by the Judicial system as well as a high percentage of the award is more of a conflict of interest than the laws should allow." (*Id.*) Ironically, this is one of the few cases in which there has been oversight other than by the "Judicial system," as the Independent Fiduciary, Ms. Hennessey, has approved the requested fee.

Mr. Meerpohl also opines that former New York Attorney General Eliot Spitzer used the MMC case as "a springboard to Governor of New York," and that an award of roughly 33% is an "irony" and "too great an issue to overlook by any justice, no matter how blind." (*Id.*) Mr. Meerpohl is, of course, entitled to vent his frustration, but he fails to articulate any reason why the requested fee and expenses are excessive. His suggestion that an award of "95% of expenses plus a reasonable finder's fee of 5 to 10% of the award would be fair," misunderstands the litigation process. Plaintiffs' Counsel are not requesting a "finder's fee," nor would it be appropriate to give them one. They are seeking a fee to be paid for the work they have done litigating this case. Accordingly, the Court rejects Mr. Meerpohl's objection to the requested fees and expenses.

Finally, the Court reiterates that the Independent Fiduciary has reviewed Lead Counsel's requests, and that she has no objection to the requested fees, expenses or case contribution awards. (Objections Mem. at 7.) The Independent Fiduciary's approval, together with the fact that only two objections have been filed—both meritless—weigh heavily in support of the Court's decision to award the requested fees and expenses.

### *CONCLUSION*

For the reasons stated above, the Court (1) approves the Settlement; (2) certifies the Class for Settlement purposes; (3) determines that the notice provided to the Class was appropriate and sufficient; (4) approves the Plan of Allocation; (5) awards attorneys' fees in the amount of $11,655,500; (6) orders

reimbursement of $1,270,915.40 in expenses advanced by Plaintiffs' Counsel; and (7) awards $15,000 to each of the three Named Plaintiffs, Donald Hundley, Conrad Simon and Leticia Hernandez, in recognition of their efforts on behalf of the Class.